2024 IL App (1st) 221681
Opinion filed June 20, 2024
Third Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| | ) | Nos. 17 CR 16663 |
| v. | ) | 17 CR 16664 |
| | ) | 17 CR 16665 |
| | ) | |
| JAMES ALLEN, | ) | Honorable |
| | ) | Charles P. Burns |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAN TINE delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial, defendant James Allen was found guilty of two counts of residential burglary, two counts of aggravated criminal sexual assault, and one count of home invasion and was sentenced to a total of 63 years in prison. On appeal, defendant argues that (1) his waiver of his right to trial counsel was invalid, (2) the jury instructions on residential burglary were erroneous, (3) the State failed to prove him guilty of residential burglary because the evidence did not establish his intent to commit theft, and (4) his conviction for home invasion should be vacated

pursuant to the one-act, one-crime rule. For the following reasons, we affirm defendant's convictions for aggravated criminal sexual assault and home invasion but reverse his convictions for residential burglary and remand for a new trial on those charges.

¶ 2                                    I. BACKGROUND

¶ 3     Defendant was charged under three case numbers: 17 CR 16663, 17 CR 16664, and 17 CR 16665. All charges arose out of events that occurred in a condominium building in downtown Chicago on October 29, 2017, and the three cases were tried together.[1] Each case number related to a different unit in the building. The State proceeded to trial on the following charges: one count of residential burglary premised on entering unit 407 with intent to commit theft (720 ILCS 5/19-3(a) (West 2016)) in case number 17 CR 16663; one count of residential burglary premised on entering unit 909 with intent to commit theft (*id.*) in case number 17 CR 16664; and, in case number 17 CR 16665, two counts of aggravated criminal sexual assault premised on bodily harm (*id.* § 11-1.30(a)(2)) and one count of home invasion premised on criminal sexual assault (*id.* § 19-6(a)(6)) arising out of defendant's actions in unit 515.

¶ 4                              A. Pretrial Proceedings

¶ 5     Approximately five months before trial, on April 7, 2021, defendant stated that he sought to "exercise [his] Fifth Amendment rights to self-representation, *pro per*, not to be confused with *pro se*, also reserving the right to be assisted by counsel." Defendant complained that he had been appointed three different assistant public defenders (APDs) and the most recent APD "ha[d] the least experience" of all three. The court agreed that defendant had the right to represent himself

---

[1]We will refer to the condominium units by their numbers because that is how the State charged the case and because it aids in understanding the facts of the case. However, for the sake of the residents' privacy, we will not otherwise identify the building's location.

but cautioned that he would be held to the same standard as an attorney and suggested that he confer with his most recent APD before making a final decision.

¶ 6 On May 11, 2021, defendant's APD stated that he conferred with defendant and that defendant still wanted to represent himself. The court explained to defendant that he had "three open cases" and that "[a]ll these cases are serious" and asked if he was sure he wanted to represent himself. Defendant responded, "I'm positive." The court then advised defendant of the charges in each case and explained that defendant could be sentenced to 18 to 90 years in prison in case number 17 CR 16665 and 4 to 15 years each in case numbers 17 CR 16664 and 17 CR 16663. The court also explained that probation was not available, that defendant could be fined $25,000 in each case, and that he would be on parole for four years after completing his sentence. Defendant stated that he understood the charges and possible sentences and that he wanted to represent himself. The court then explained that defendant had the right to an attorney and what an attorney would do at trial, and again advised defendant that he would be held to the same standard as an attorney if he represented himself. Defendant again confirmed that he wanted to represent himself.

¶ 7 The court explained that defendant did not have a right to standby counsel and that appointing standby counsel was a matter of the court's discretion. Defendant never requested standby counsel but expressed doubt that he could "cross-examin[e]" himself at trial. At a hearing on August 6, 2021, a private attorney informed the court that she met with defendant the previous day. Defendant asked the private attorney to serve as standby counsel, but she told him she could not. Defendant again informed the court that he wanted to represent himself.

¶ 8 Shortly before trial, on September 9, 2021, the State filed a motion for defendant to be evaluated for fitness to represent himself, which the court granted. The following day, Dr.

Christofer Cooper found that defendant was fit to represent himself or to stand trial with counsel, whichever he chose. Dr. Cooper noted that defendant was able to explain why he wanted to represent himself and that he understood the charges against him and the nature and purpose of legal proceedings. Defendant was taking antipsychotic medication. Dr. Cooper evaluated defendant again during trial on September 15, 2021, and reached the same conclusions.

¶ 9                                                    B. Trial

¶ 10     In his opening statement, defendant explained to the jury that it was his first time at trial and his first time representing himself. He conceded that "[e]verything the State is saying, happened" but argued that the State could not prove his intent. Defendant also explained that he was "pleading insanity" because he "was out of [his] mind on the night of the commission of the crime" and had been "diagnosed with over six different disorders."

¶ 11                                    1. The State's Case-in-Chief

¶ 12     The evidence established that residents of the condominium building used a key fob to enter the building's main door but that guests had to ring the buzzer, be admitted by security, and sign in. The State moved into evidence security camera video recordings from the early morning hours of October 29, 2017. The videos depict defendant, who is naked, crossing the street toward the building and approaching the glass lobby doors. Defendant stands outside the lobby doors until a security guard stationed at the front desk lets him in. Defendant sits at the security desk and looks at a computer, then boards an elevator and takes it to one of the upper floors. The security guard who allowed defendant into the building did not testify at trial. The evidence established that he was fired after this incident.

¶ 13 Timothy Parent testified that he lived in unit 509. At approximately 5:30 a.m. on October 29, 2017, Parent awoke to someone knocking on his door and yelling, "I know she's in there, I know—my girl is in there, I know my daughter's in there." Parent looked through the peephole and saw defendant, whom he identified in court. Parent called security from inside his unit. A security guard responded within minutes, but no one was in the hallway outside Parent's unit. The security guard then left. Parent exited his apartment, and as he waited to board an elevator, a man ran down the hallway screaming for help, yelling "he's on top of my roommate and he's raping her." Parent followed the man yelling for help to another unit and saw defendant standing naked in the doorway. Parent told defendant to get out, and defendant charged at him, so Parent ran down a stairwell hoping to lead defendant to security in the lobby. Parent reached the lobby, but defendant did not follow him. Parent told a security guard that defendant was attacking someone, and the security guard called police. Parent identified a photograph of a decorative wreath that was taken from his unit's front door sometime between October 28 and October 29, 2017.

¶ 14 T.F. testified that she lived in unit 515.[2] She and her friend Daniel McEvoy went out to celebrate her birthday and returned to her unit at approximately 2 a.m. on October 29, 2017. T.F. slept in her bed, and McEvoy slept on the couch. T.F. did not remember whether she locked the door that night. She awoke to defendant, whom she identified in court, naked on her bed. Defendant grabbed T.F.'s hair, shoved her head toward his erect penis, and "told [her] to suck it." T.F. tried to pull back, but the man shoved her head down "[v]ery forcefully." T.F. started to cry and said "no," but defendant repeatedly told her to "shut the f*** up, don't say anything, be quiet." Defendant forced his penis into T.F.'s mouth for several minutes, then pulled her dress up and told

---

[2]T.F. is a victim of sexual assault, so we use her initials to protect her privacy. See *People v. Munoz-Salgado*, 2016 IL App (2d) 140325, ¶ 1 n.1.

her to lie down. Defendant lay on top of T.F., inserted his penis into her vagina, placed his hand on her throat, and applied pressure.

¶ 15    McEvoy came into the bedroom, and T.F. said, "[P]lease help me." McEvoy asked defendant who he was, and defendant responded, "I'm Satan." Defendant removed himself from T.F. and chased McEvoy into the hallway. Police arrived approximately five minutes later, and T.F. told them what happened. She noticed handprints on the wall of her unit and a wreath and a fire extinguisher tag that did not belong to her in the unit. T.F. went to the hospital, and staff performed a sexual assault kit. She suffered a vaginal tear and a whiplash-like neck injury. T.F. then went to a police station but was unable to identify defendant in a photo array. At trial, T.F. identified a photograph of the wreath and fire extinguisher tag she found on her bedroom floor, a photograph of her bed, the clothing she was wearing when defendant sexually assaulted her, the clothing she wore to the hospital, and her bedding. The State moved these items into evidence. T.F. identified defendant in court as the man who sexually assaulted her, and defendant apologized to her for doing so.

¶ 16    McEvoy's testimony was consistent with T.F.'s. He testified that he and T.F. went out to celebrate her birthday and returned to T.F.'s unit at approximately 2:30 a.m. on October 29, 2017. He woke up when he heard a struggle in T.F.'s bedroom. He went to check on her and saw defendant, whom he identified in court, naked on top of T.F., sexually assaulting her. McEvoy moved toward defendant and asked who he was; defendant responded, "I'm Satan." Defendant lunged at McEvoy, who ran into the hallway outside the unit and yelled for help as defendant pursued him into a stairwell and grabbed the hood of his sweatshirt. When McEvoy reached the lobby, he told security that a man was sexually assaulting T.F. and asked them to call police.

McEvoy later saw defendant as police were escorting him out of the building in handcuffs. Defendant was "jovial" and "laughing under his breath" and said, "I got her good."

¶ 17    Daniel Devine testified that he and his roommate lived in unit 407. They went out with friends on the night of October 28, 2017, and, upon returning home, left the door unlocked so that Devine's roommate's brother could sleep on the couch. Between 4 and 5 a.m. on October 29, Devine woke up and saw a naked man, whom he identified as defendant, walking toward his bed. Devine told defendant to leave. Defendant said he had friends in unit 909 or 929. Devine testified that "it sounded like [defendant] was sort of not all there, like he was on something." Defendant was wearing Devine's hats and a scarf. Defendant then sat on Devine's balcony with a bottle of wine from the kitchen counter and yelled, "I own this place, I own this building." Devine again told defendant to leave and demanded that he take off the hats and scarf. Defendant put a hat on the counter but left the unit with "a handful of stuff" belonging to Devine and his roommate. Sometime later, a resident of a ninth-floor unit returned Devine and his roommate's belongings, including a cell phone, keys, and a scarf.

¶ 18    Brian Morrill testified that he lived in unit 909. Morrill went to bed at approximately 10:30 p.m. on October 28, 2017, and did not lock his door. At approximately 5:30 the following morning, he awoke to his dog barking and saw defendant, whom he identified in court, standing naked in his kitchen. Morrill asked defendant what he was doing; defendant mumbled a response that sounded like "I own this building." Morrill returned to his bedroom, shut the door, and called security. When Morrill opened his bedroom door again, defendant was standing in front of it. Defendant picked up Morrill's guitar and pretended to play it. Morrill closed the bedroom door until police arrived. At that point, defendant was sitting on Morrill's couch with the guitar and a

bottle of wine from Morrill's wine rack. Police handcuffed defendant and removed him from the unit. Morrill found a scarf and a set of keys, neither of which belonged to him, in his unit. He also noticed that his wallet had been moved from the kitchen to near the wine rack. Morrill identified still photographs from a police body camera video recording, which depicted defendant sitting naked on his couch playing a guitar and wearing sunglasses. Morrill also identified photographs of the lobby of the condominium building, the hallway of his unit, the couch that defendant sat on, and his guitar that defendant picked up. The State moved these photographs into evidence.

¶ 19     John Jones testified that he worked as a security guard at the building. When he arrived at approximately 6:25 a.m. on October 29, 2017, an alarm was going off, and a resident said that someone was "still in the building." Jones called police, and another resident came to the lobby and said, "he's raping my roommate." A resident on the ninth floor called the security desk and said that "the individual was in his apartment and he was behind a locked door," which Jones relayed to police. Jones later saw defendant naked in the lobby with police. Jones identified still photographs from one of the building's security cameras, which depicted defendant crossing the street, entering the building through the front door, and waiting for an elevator in the lobby. The State moved these photographs into evidence.

¶ 20     Chicago police sergeant Mary Nanninga testified that she responded to a sexual assault call at the condominium building at approximately 6 a.m. on October 29, 2017. Nanninga found defendant in Morrill's unit naked on the couch with a guitar and a bottle of wine and wearing sunglasses. Another officer handcuffed defendant and escorted him to the lobby. Defendant was calm and cooperative and said that he lived in Morrill's unit. Nanninga identified a video recording from Officer Rafael Lee's body camera, which the State moved into evidence. The video depicts

Morrill allowing Lee into his unit, where Lee finds defendant naked on Morrill's couch, wearing sunglasses and holding a guitar. Defendant complies with being handcuffed, and Lee escorts him out of the unit.

¶ 21    Officer Robert Williams testified that between 5:30 and 6 a.m. on October 29, 2017, he responded to a call for assistance at the condominium building and saw defendant, whom he identified in court, naked and handcuffed in the lobby. Williams placed defendant in his police vehicle and transported him to a hospital. Defendant told a triage nurse that his back hurt because he "was f***ing her."

¶ 22    Officer Ron Bialota testified that he was on duty as an evidence technician on the morning of October 29, 2017. At approximately 7:45 a.m., he went to the condominium building and photographed the lobby and unit 515. He recovered and inventoried bedding and clothing from unit 515's bedroom, along with a fingerprint on the wall. Bialota also photographed unit 909. Bialota identified all the photographs he took and items he recovered, and the State moved them into evidence.

¶ 23    Detective Andrew Burns testified that he interviewed defendant, whom he identified in court, at the hospital on October 29, 2017. Burns provided *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and defendant indicated that he understood them. Defendant consented to a buccal swab, which Burns performed and inventoried. Burns identified the buccal swab and the consent form that defendant signed, and the State moved them into evidence.

¶ 24    Nurse Debra Terri-Larson testified that she administered a sexual assault kit on T.F. at the hospital on October 29, 2017. At the hospital, T.F. said that she woke to a man on top of her demanding that she perform oral sex and that the man "went on to assault her vaginally." Terri-

Larson identified the sexual assault kit she performed. The parties stipulated that police inventoried the sexual assault kit.

¶ 25 Four Illinois State Police forensic scientists testified as expert witnesses. Their testimony established that fingerprints recovered in this case were not suitable for comparison and the sexual assault kit and T.F.'s clothing and bedding were negative for the presence of semen. However, defendant's DNA matched Y chromosome profiles on T.F.'s oral and face swabs.

¶ 26                                    2. Defendant's Case in Chief

¶ 27 Defendant testified that he had "no recollection of the night in question." The last thing he remembered was smoking cannabis at home approximately a week prior to October 29, 2017. Defendant testified that, on October 29, 2017, he was "under the hallucination that [he] was looking for [his] daughter and that [her] mother was throwing [his] daughter a hotel party" and that "people in the building took off [his] clothes." Defendant acknowledged that he told police the condominium building's address and identified other buildings nearby. He also told police about Morrill's dog barking and that he played a guitar, knocked on doors on the fifth floor, and went to the ninth floor.

¶ 28 Dr. Michael Byrne, whom one of defendant's previous attorneys retained, was qualified as an expert in forensic psychiatry. He evaluated defendant on November 6, 2019. Defendant told Dr. Byrne that he did not remember the events of October 29, 2017. Defendant experienced delusions of "being abducted by aliens and being involved in the Illuminati, [and] knowing Jay-Z." Dr. Byrne opined that defendant was not "able to appreciate the criminality of [his] conduct" on October 29, 2017. Dr. Byrne based that opinion on defendant's calm entry into the building, which was inconsistent with "trying to discreetly commit a crime," and defendant taking "items of

inconsequential value" while entering units that he happened to find unlocked. Defendant's statements that he owned the building suggested a "grandiose delusional thought that [defendant was] wealthy and important." Defendant did not attempt to leave the building as though he were fleeing a crime scene and did not resist arrest. Dr. Byrne acknowledged that intent to commit crimes such as sexual assault and burglary can be formed when the opportunity arises and that people with schizoaffective disorder can understands the criminality of their conduct. Dr. Byrne testified that defendant being administered antipsychotic medication at the hospital after his arrest was "indicative of a very serious psychotic decompensation." Dr. Byrne diagnosed defendant with schizoaffective disorder, bipolar type, and opioid and cannabis disorder. Dr. Byrne acknowledged that he was the only doctor to have diagnosed defendant with schizoaffective disorder.

¶ 29                    3. The State's Case in Rebuttal

¶ 30    The State's evidence in rebuttal established that defendant was first hospitalized for mental illness at St. Bernard Hospital and Health Care Center (St. Bernard) on October 31, 2015. He tested positive for cannabis and alcohol and was diagnosed with acute psychosis due to substance abuse. Defendant was transferred to Chicago Lakeshore Hospital and then to the University of Illinois Hospital (UIC). Doctors at UIC concluded that defendant was suffering from cannabis-induced psychosis and ruled out any other kind of primary psychotic illness. Defendant was discharged from UIC on November 9, 2015, and was not prescribed any medication. Defendant was evaluated at St. Bernard following his arrest on October 29, 2017. He tested positive for cannabis and was diagnosed with acute psychosis. The following day, Dr. Kartan of Cermak Health Services of Cook County (Cermak) diagnosed defendant with substance abuse disorder, depression, and anxiety, but ruled out schizophrenia and bipolar disorder. Defendant told Dr. Kartan he used a synthetic form

of cannabis called "K2" two days before the incident and had used heroin, Xanax, and alcohol in the past. On November 5, 2017, defendant told another doctor at Cermak that he smoked "a blunt laced with PCP" near the time of the offense and did not remember anything that happened after that. At the time of trial, defendant was taking antipsychotic medication.

¶ 31    Dr. Christofer Cooper testified that he was a forensic psychologist and the assistant director of forensic clinical services for the circuit court of Cook County. He was qualified as an expert in forensic psychology. Dr. Cooper examined defendant on February 4, 2020, and concluded that defendant did not exhibit "any symptoms of a mental illness at the time of the offense that would have impaired his ability to appreciate the criminality of his conduct." That is, defendant was legally sane on October 29, 2017. Dr. Cooper diagnosed defendant with substance-induced psychotic disorder and severe cannabis use disorder as of October 29, 2017, and severe cannabis use disorder and malingering as of February 4, 2020. The differing diagnoses reflected that, at the time of the incident, defendant "was experiencing substance-induced symptoms or psychotic symptoms that he doesn't normally have." The diagnosis of malingering indicated that defendant exaggerated having delusions about the Illuminati and "various rappers." Dr. Cooper opined that defendant being disruptive in the courtroom was not the product of mental illness; rather, it was intentional behavior. Dr. Cooper disagreed with Dr. Byrne's diagnosis that defendant suffered from schizoaffective disorder as unsupported by defendant's clinical history.

¶ 32    Dr. Mathew Markos testified that he was a forensic psychiatrist and the director of forensic clinical services for the circuit court of Cook County. He was qualified as an expert in the field of forensic psychiatry. Dr. Markos examined defendant on September 1, 2020. Defendant said that he had no memory of this incident. Dr. Markos opined that defendant experienced cannabis-

induced psychosis but was legally sane on October 29, 2017. He diagnosed defendant with "cannabis disorder" and concluded that defendant did not suffer from a primary psychotic illness, including schizophrenia or schizoaffective disorder.

¶ 33    At the end of its case in rebuttal, the State moved into evidence a video recording of Detective Burns's interview of defendant at the hospital. Defendant did not object. No witnesses testified regarding this video. The video depicts defendant lying in a hospital bed. He says that he understands his *Miranda* rights and agrees to speak with Burns and an assistant state's attorney (ASA). Defendant is groggy and appears to be falling asleep at times during the interview but says he is following the ASA's questions. Defendant states that he went downtown for his daughter's birthday party early on the morning of October 29, 2017. He was not under the influence of drugs or alcohol and was clothed when he entered the condominium building. Defendant says that his daughter and her mother had lived in that building for "a couple of years" but that he may have "picked the wrong hotel." Defendant identifies the building by the street it was on and buildings that were across the street from it. He had never been to that building before. Defendant spoke to a man at the front desk, who directed him to the elevators. Defendant was looking for unit 929 but went to the fifth floor because his daughter was turning five. He knocked on the door of unit 529, which Burns tells him is actually unit 509. Someone allowed defendant into a unit where a dog was barking. Defendant wanted to play "a whole bunch of guitars," but someone in the unit "snatched" his clothes. Defendant repeatedly denies that he sexually assaulted a woman. Approximately 16 minutes into the interview, defendant says that he is "through f*** talking" and is hungry and thirsty. Burns and the ASA give defendant water, and Burns says that they will try

to get him food. Defendant claims that police arrested him for no reason. Burns and the ASA end the interview shortly after defendant again says that he is "through talking."

¶ 34                    4. Jury Instructions, Verdict, and Posttrial Proceedings

¶ 35    During the jury instructions conference, the State proposed Illinois Pattern Jury Instructions, Criminal, No. 14.13 (approved July 29, 2022) (hereinafter IPI Criminal No. 14.13), and Illinois Pattern Jury Instructions, Criminal, No. 14.14 (approved July 29, 2022) (hereinafter IPI Criminal No. 14.14), on residential burglary. Defendant did not object. The court *sua sponte* noted that the residential burglary "statute also says enters or [ ]knowingly and without authority remains within the dwelling place of another." The State said that it had "no objection to doing a non-IPI to include 'or remains within.' " The following exchange occurred:

"THE COURT: Here's the statute: Residential burglary, 720 ILCS 5/19-3(a). A person commits residential burglary when he or she knowingly and without authority enters or knowingly and without authority remains within the dwelling place of another, or any part therein, with the intent to commit a felony or theft.

That's the statute. Do you have any objection to changing that instead of—it's going to be—it would be for the first proposition, knowingly entered or knowingly without authority remains within the dwelling place of another with the intent to commit the offense of theft.

Do you have any objection to that?

THE DEFENDANT: No objection.

THE COURT: I think that needs to be changed. I'm kind of surprised that's not an IPI, but that's what the statute says.

- 14 -

[THE STATE]: I agree."

¶ 36    Prior to closing arguments, the court orally instructed the jury as follows:

"A person commits the offense of residential burglary when he knowingly and without authority enters the dwelling place of another with the intent to commit therein the offense of theft.

To sustain the charge of residential burglary, the State must prove the following propositions:

First Proposition: That the defendant knowingly entered the dwelling place of another; and

Second Proposition: That the defendant did so without authority; and

Third Proposition: That the defendant did so with the intent to commit therein the offense of theft."

¶ 37    However, the written instructions that the jury received, which the court had previously proposed and which neither party objected to, stated:

"A person commits the offense of Residential Burglary when he knowingly and without authority enters or knowingly and without authority remains within the dwelling place of another with the intent to commit therein the offense of theft. ***

To sustain the charge of Residential Burglary, the State must prove the following propositions:

n [*sic*]

First Proposition: That the defendant knowingly and without authority entered or knowingly and without authority remained within the dwelling place of another; and

- 15 -

Second Proposition: That the defendant did so without authority; and

Third Proposition: That the defendant did so with the intent to commit therein the offense of theft."[3]

¶ 38    In closing, the State read the residential burglary definition instruction as saying that a person commits residential burglary "when he knowingly and without authority enters *or* knowingly without authority remains within the dwelling place of another with the intent to commit therein the offense of theft." (Emphasis added.). However, the State read the first proposition of the residential burglary issues instruction as "the defendant knowingly entered *and* remained in the dwelling place of another." (Emphasis added.). The State argued that defendant entered Morrill's unit without authority and entered and remained in Devine's unit without authority. With respect to defendant's intent to commit theft, the State contended that "[i]t doesn't matter what his intention was when he walked in" because he took "electronics, a lanyard, a scarf, *** somebody's cell phone and a bottle of wine" from Devine's unit and picked up a wallet, a bottle of wine, and a guitar in Morrill's unit.

¶ 39    In response, defendant argued that T.F., McEvoy, and Morrill were not credible and blamed the security guard who let him into the condominium building. He complained about the trial court's rulings on his objections and explained that he did not "trust the Public Defender's Office." Defendant then began discussing the Illuminati and celebrity Jennifer Hudson's supposed connection to the trial court judge, at which point the trial court sustained the State's objection and held a sidebar in chambers. Defendant also threatened to bring the jury back to retry the case

---

[3]We note that the first and second propositions of the written issues instruction on residential burglary contain duplicative language regarding lack of authority.

indefinitely by "catch[ing] a contempt charge." He conceded that the State "proved [him] guilty beyond a reasonable doubt" but argued that it was up to the jury "to decide if [he] was able to appreciate the criminality of [his] acts." Defendant concluded by arguing that there was reasonable doubt as to whether he was intoxicated at the time of the offense and contended that he could not appreciate the criminality of his acts due to mental illness.

¶ 40    During the State's rebuttal argument, the court held defendant in contempt for giving the court "the finger" when it overruled an objection and for swearing at the court during a sidebar in chambers.

¶ 41    The jury found defendant guilty of two counts of aggravated criminal sexual assault and one count of home invasion as to T.F., one count of residential burglary as to Devine's unit, and one count of residential burglary as to Morrill's unit.

¶ 42    Defendant filed a *pro se* motion for a new trial, arguing that the State improperly introduced hearsay evidence and his 2016 burglary conviction, that Dr. Cooper and Dr. Markos's diagnoses were incorrect, and that records from the day of his arrest indicated that he was involuntarily admitted to a mental health facility. An APD filed an amended motion for a new trial, which argued in relevant part that the State failed to prove defendant guilty beyond a reasonable doubt. Neither motion for a new trial raised the validity of defendant's waiver of his right to counsel, the residential burglary jury instructions, or one-act, one-crime issues. The trial court denied defendant's motions for a new trial.

¶ 43    The court sentenced defendant to a total of 63 years in prison. Defendant filed a motion to reconsider sentence, which was denied.

¶ 44    Defendant timely appealed.

¶ 45                                    II. ANALYSIS

¶ 46    On appeal, defendant contends that (1) his waiver of his right to counsel was invalid, (2) the jury instructions on residential burglary were erroneous, (3) the State failed to prove his intent to commit theft as an element of residential burglary, and (4) his conviction for home invasion should be vacated pursuant to the one-act, one-crime rule.

¶ 47                            A. Waiver of Trial Counsel

¶ 48    Defendant contends that trial court erred in accepting his waiver of his right to counsel. Specifically, defendant argues that (1) he could not validly waive his right to counsel due to mental illness, (2) he did not understand the potential consequences of presenting an insanity defense, and (3) the trial court abused its discretion by not appointing standby counsel.

¶ 49    The sixth amendment to the United States Constitution guarantees criminal defendants the right to assistance of counsel and the right to proceed *pro se*. U.S. Const., amend. VI; *People v. McNutt*, 2020 IL App (1st) 173030, ¶ 78 (citing *People v. Haynes*, 174 Ill. 2d 204, 235 (1996)). A defendant's right to self-representation is "as basic and fundamental as [the] right to be represented by counsel." (Internal quotation marks omitted.) *People v. Marcum*, 2024 IL 128687, ¶ 43. A trial court must honor a defendant's decision to proceed *pro se* even though it might be unwise. *McNutt*, 2020 IL App (1st) 173030, ¶ 78. We will reverse a trial court's acceptance of a defendant's waiver of counsel only if the trial court abused its discretion. *Id.* ¶ 85. An abuse of discretion occurs when the trial court's ruling was arbitrary, fanciful, or unreasonable to such an extent that no reasonable person would agree with it. *Id.*

¶ 50    Defendant did not raise his waiver of counsel in his posttrial motion. Generally, to preserve an issue for appellate review, a defendant must object at trial and raise the issue in a posttrial

motion. *People v. Brand*, 2021 IL 125945, ¶ 32. If the defendant fails to do so, he forfeits the issue on appeal. *Id.* However, the plain error rule allows us to review an unpreserved issue when a clear or obvious error occurred and either (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant regardless of the seriousness of the error or (2) the error was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process regardless of the closeness of the evidence. *People v. Sebby*, 2017 IL 119445, ¶ 48. The validity of a defendant's waiver of counsel affects a fundamental right, so we will review for plain error. See *People v. Khan*, 2021 IL App (1st) 190051, ¶ 40. The defendant has the burden of persuasion in a plain error analysis. *Id.* ¶ 41. The first step of plain error review is to determine whether a clear or obvious error occurred. *Id.*

¶ 51                                         1. Validity of Waiver

¶ 52     Defendant argues that he did not validly waive his right to counsel due to his mental illness. To validly waive the right to counsel, a defendant must first be fit to stand trial. *People v. Harris*, 2013 IL App (1st) 111351, ¶ 79. To be fit to stand trial, a defendant must have a rational and factual understanding of the proceedings against him. *People v. Washington*, 2016 IL App (1st) 131198, ¶ 70. Illinois law presumes that a defendant is fit to stand trial. 725 ILCS 5/104-10 (West 2016). A defendant is unfit if, because of a mental or physical condition, he is unable to understand the nature and purpose of the proceedings or unable to assist in his defense. *Id.* In this case, there is no dispute that defendant was fit to stand trial. Dr. Cooper found defendant fit before and during trial, and even retained defense expert Dr. Byrne agreed with that conclusion.

¶ 53     Because defendant was fit to stand trial, the issue becomes whether his waiver of counsel was knowing and voluntary. *Harris*, 2013 IL App (1st) 111351, ¶ 79; *Godinez v. Moran*, 509 U.S.

389, 400-02 (1993) (if a defendant is fit to stand trial and knowingly and voluntarily waives his right to counsel, then he receives a fair trial that comports with due process); *People v. Kidd*, 178 Ill. 2d 92, 104 (1997). All waivers of counsel must be "voluntary, knowing, and intelligent." *Marcum*, 2024 IL 128687, ¶ 43. To ensure that a defendant's waiver of counsel is voluntary, knowing, and intelligent, the trial court must comply with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984). *Marcum*, 2024 IL 128687, ¶ 44. Rule 401(a) provides:

" 'Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:

(1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has the right to counsel and, if he is indigent, to have counsel appointed for him by the court.' " *Id.* (quoting Ill. S. Ct. R. 401(a) (eff. July 1, 1984)).

Strict, technical compliance with Rule 401(a) is not always required. *Id.* ¶ 46. Substantial compliance with Rule 401(a) is sufficient if the record indicates that the defendant's waiver of counsel was knowing and voluntary and the admonishments the defendant received did not prejudice his rights. *Id.* We assess each waiver of trial counsel on its own facts. *Id.*

¶ 54    When defendant first expressed his desire to represent himself, the trial court advised him to discuss the matter with his APD, which he did. On the following court date, defendant confirmed that he wanted to proceed *pro se*, and the court admonished him pursuant to Rule 401(a). The court informed defendant of the charges in all three cases, the sentencing ranges in each case, the unavailability of probation, possible fines, and the length of his parole. The court also advised defendant that he had the right to an attorney, explained what an attorney would do, and reminded defendant that he would be held to the same standard as an attorney if he represented himself. The record establishes that the court thoroughly advised defendant of the consequences he faced and the risks of representing himself and that the court confirmed multiple times that defendant wanted to proceed *pro se*. There is no question that the trial court complied with Rule 401(a).

¶ 55    Nevertheless, defendant argues that the "totality of the circumstances," such as his history of mental illness, "use of psychoactive drugs," and behavior during trial shows that he was incapable of waiving his right to counsel. The record does reflect defendant engaging in inappropriate arguments with the trial court and using profanity and obscene gestures. However, the court was vigilant about holding sidebars in chambers when defendant began acting out. Because the jury did not see many of defendant's outbursts, it is difficult for us to say whether or how those outbursts affected the jury's verdict. During deliberations, the jury expressed no concerns about defendant's self-representation. In addition, defendant's disrespectful statements were almost always the product of his frustration with the trial court's rulings. That is, defendant clearly understood what was happening at trial; he simply did not agree with the court's rulings and expressed that disapproval outside of the jury's presence in inappropriate ways.

¶ 56    Defendant's argument on this point comes with the benefit of hindsight. When the court allowed defendant to proceed to trial *pro se*, the court did not know if and how defendant might act during trial. The court knew only that Dr. Cooper had found defendant fit to stand trial and to represent himself and that defendant had insisted on proceeding *pro se* even after the court's admonishments about the risks of doing so.

¶ 57    Defendant cites *People v. Lego*, 168 Ill. 2d 561 (1995), for the proposition that a defendant who is fit to stand trial may still be unable to validly waive his right to counsel. In *Lego*, unrebutted testimony from two expert witnesses established that the *pro se* defendant suffered from mental illnesses that caused him to experience delusions that he had practiced as a lawyer for decades and that his legal skills were equal to or better than any attorney. *Id.* at 568-78. The supreme court found that, considering the impact of the defendant's mental illnesses on his ability to judge his own legal skills, he could not validly waive his right to counsel. *Id.* at 577. By contrast, in this case, defendant's history of mental illness does not suggest that he was wholly incapable of making a knowing, voluntary, and intelligent waiver of counsel. Rather, it indicates that defendant has psychotic episodes when he abuses cannabis. There is no indication that defendant was experiencing a cannabis-induced psychotic episode when he decided to proceed *pro se* or at any point during trial. Unlike *Lego*, no expert witness in this case testified that defendant was unable to validly waive his right to trial counsel. And, unlike the defendant in *Lego*, defendant was not under the delusion that his trial skills were equal to those of an attorney. Defendant repeatedly acknowledged the disadvantage he was at in trying this case without formal legal training. *Lego* is distinguishable and does not support reversal. Accordingly, we find that defendant's waiver of

counsel was knowing, voluntary, and intelligent and that defendant's mental illness did not render him incapable of validly waving his right to counsel.

¶ 58                                    2. Insanity Defense

¶ 59    Defendant next contends that his waiver of counsel was invalid because he presented an insanity defense without understanding the risks of doing so. Specifically, defendant claims that he did not know that an acquittal by reason of insanity might result in his involuntary commitment rather than going free as he would after a typical acquittal.

¶ 60    An insanity defense asserts that the defendant lacked the capacity to appreciate the criminality of his conduct due to "mental disease or mental defect." 720 ILCS 5/6-2(a) (West 2016). A finding of not guilty by reason of insanity is an acquittal. *People v. Harrison*, 226 Ill. 2d 427, 441 (2007). However, when a defendant is acquitted by reason of insanity, the Department of Human Services (DHS) must conduct an evaluation as to whether the defendant requires mental health services. 730 ILCS 5/5-2-4(a) (West 2016). If the evaluation is inpatient, the defendant must be "placed in a secure setting." *Id.* That is, section 5-2-4 "authorizes the acquitee's involuntary commitment." *People v. Bethke*, 2014 IL App (1st) 122502, ¶ 14. A person committed to DHS custody following an acquittal by reason of insanity may petition for discharge but must prove by clear and convincing evidence that he no longer suffers from a mental illness. *People v. Gunderson*, 2017 IL App (1st) 153533, ¶ 19; 730 ILCS 5/5-2-4(e), (g) (West 2016).

¶ 61    Rule 401(a) does not require admonishments about the potential consequences of an insanity defense. Ill. S. Ct. R. 401(a) (eff. July 1, 1984). It requires only admonishments about the "minimum and maximum sentence" in the event of conviction. *Id.* As explained above, the trial court complied with that requirement. Defendant asks us to create additional Rule 401(a)

- 23 -

admonishments when a *pro se* defendant plans to present an insanity defense. We decline that invitation for two reasons. First, the current version of section 6-2(a), which codifies the insanity defense, has been unaltered since 1998 (720 ILCS 5/6-2(a) (West 1998)), and Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) has been unaltered since 1984. Neither provision has been amended to connect an insanity defense to a waiver of counsel. Our supreme court and our legislature certainly know that criminal defendants sometimes represent themselves, sometimes present insanity defenses, and could potentially do both. We will not create additional Rule 401(a) admonishments when our supreme court and legislature have declined to do so for at least 25 years.

¶ 62     Furthermore, no Illinois authority supports the additional Rule 401(a) admonishments that defendant seeks. The Fourth District has suggested 10 additional admonishments to defendants who wish to proceed *pro se*, but none of them addresses the risks of an insanity defense. *People v. Hood*, 2022 IL App (4th) 200260, ¶ 79 (citing *People v. Ward*, 208 Ill. App. 3d 1073, 1081-82 (1991)). The case law that defendant cites does not suggest the creation of additional Rule 401(a) admonishments regarding the potential consequences of presenting a *pro se* insanity defense. See, *e.g.*, *People v. Gettings*, 175 Ill. App. 3d 920, 921 (1988) (the represented defendant chose not to present an insanity defense); *United States v. Read*, 918 F.3d 712, 719 (9th Cir. 2019) (counsel presented an insanity defense over the defendant's clear rejection of such a defense). Accordingly, we find that the trial court did not err by not admonishing defendant about the potential consequences of an acquittal by reason of insanity before accepting his waiver of counsel.

¶ 63                                    3. Standby Counsel

¶ 64     Defendant argues that the trial court abused its discretion by not appointing him standby counsel for trial. Standby counsel assists a *pro se* defendant " ' "in overcoming routine procedural

or evidentiary obstacles" ' " to goals such as introducing evidence or objecting to testimony. *People v. Khan*, 2021 IL App (1st) 190679, ¶ 72 (quoting *People v. Gibson*, 136 Ill. 2d 362, 378 (1990), quoting *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984)). Standby counsel can also help ensure compliance with the rules of courtroom protocol and procedure. *Id.* However, a *pro se* defendant does not have a right to standby counsel. *Id.* Ultimately, "a defendant who chooses to represent him or herself 'must be prepared to do just that' " without the assistance of standby counsel. *People v. Moore*, 2023 IL App (1st) 211421, ¶ 106 (quoting *Gibson*, 136 Ill. 2d at 383). When deciding upon a defendant's request to appoint standby counsel, a court should consider the nature and gravity of the charges, the factual and legal complexity of the proceedings, and the ability and experience of the defendant. *Gibson*, 136 Ill. 2d at 380. We review whether the trial court erred in deciding not to appoint standby counsel for an abuse of discretion. *Id.*

¶ 65    We find that the trial court's decision not to appoint standby counsel was not an abuse of discretion. One *Gibson* factor weighed in favor of appointing standby counsel: the gravity of the charges against defendant. Defendant proceeded to trial on multiple felony charges, and there is no question that he faced substantial prison time if convicted. However, that factor alone is not enough to warrant reversal. See *People v. Pratt*, 391 Ill. App. 3d 45, 46, 58 (2009) (no abuse of discretion in denying standby counsel where the defendant was convicted of first degree murder and sentenced to 40 years' imprisonment). The other *Gibson* factors weighed against the necessity of standby counsel. This trial was not particularly complex in that defendant did not dispute the facts put forth by the State. In fact, defendant conceded that the events occurred as the State alleged and challenged only his intent to commit theft and his sanity. He and Dr. Byrne presented a substantial defense on those issues. As to defendant's experience and ability, while this was the

first time he had represented himself, Dr. Markos testified that defendant was of moderate to high intelligence and had completed two years of college. Altogether, the *Gibson* factors favored not appointing standby counsel or, at most, were roughly balanced. The trial court's decision was not so unreasonable that no one would agree with it.

¶ 66    While defendant did not explicitly request standby counsel, the record does suggest that defendant wanted standby counsel. Defendant expressed doubt that he could examine himself on the stand. He asked a private attorney to act as standby counsel, and the attorney declined to do so. However, we question how effective appointed standby counsel would have been as a practical matter. If standby counsel had been requested, the court would have appointed an APD as standby counsel. But defendant had made it clear that he did not want assistance from APDs. He repeatedly denigrated the abilities of APDs, claiming that they are not actually attorneys and that "the Public Defender has never done their job." Even if the trial court had appointed standby counsel, we are skeptical that defendant would have accepted standby counsel's assistance.

¶ 67    Defendant argues that the State took advantage of the absence of standby counsel by leading witnesses on direct examination and eliciting hearsay. To some extent that is true, and on one occasion, the trial court said as much at sidebar. However, trial court *sua sponte* intervened to stop this improper questioning. The court's intervention had approximately the same effect as a sustained objection made by standby counsel would have had.

¶ 68    Just because we or another court might have appointed standby counsel does not mean that the trial court abused its discretion in deciding otherwise. See *In re Marriage of Samardzija*, 365 Ill. App. 3d 702, 708 (2006). Abuse of discretion review is the most deferential standard of review in Illinois law. *People v. Radojcic*, 2013 IL 114197, ¶ 33. Considering the trial court's familiarity

with defendant and this case, we cannot say that no reasonable person would have taken the trial court's approach to standby counsel. Accordingly, we affirm the trial court's acceptance of defendant's waiver of his right to counsel.

¶ 69                            B. Jury Instructions on Residential Burglary

¶ 70    Defendant contends that the jury instructions on residential burglary were erroneous because the written instructions stated that the jury could find defendant guilty of that offense if they concluded that he "knowingly and without authority entered *or* knowingly and without authority remained within the dwelling place of another." (Emphasis added.) Defendant objects to the inclusion of the "remained within" language because the State charged only burglary by unauthorized entry. The State agrees that including that language was error but contends that it was "harmless error."

¶ 71    Defendant did not raise this issue in his posttrial motion. "Generally, a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion." (Internal quotation marks omitted.) *People v. Hartfield*, 2022 IL 126729, ¶ 44. Nevertheless, defendant requests plain error review. Plain error occurs where "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id.* ¶ 50. Relatedly, Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013) provides that "substantial defects [in criminal jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require." "Rule 451(c) is coextensive with the 'plain error' clause of [Illinois] Supreme Court Rule 615(a), and we construe these rules identically." (Internal quotation marks omitted.) *Hartfield*, 2022 IL 126729,

¶ 49. A "jury instruction error rises to the level of plain error only when it creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law." (Internal quotation marks omitted.) *Id.* ¶ 50.

¶ 72    "Inherent in plain-error analysis is a determination of whether any error occurred." *Id.* ¶ 51. "The function of jury instructions is to provide the jury with accurate legal principles to apply to the evidence so it can reach a correct conclusion." *Id.* "We must determine whether the instructions, taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles." (Internal quotation marks omitted.) *Id.* We review *de novo* whether the jury instructions accurately conveyed the appliable law. *Id.*

¶ 73    The residential burglary statute provides that a "person commits residential burglary when he or she knowingly and without authority enters or knowingly and without authority remains within the dwelling place of another, or any part thereof, with the intent to commit therein a felony or theft." 720 ILCS 5/19-3(a) (West 2016). Illinois courts have interpreted this language as describing two mutually exclusive theories of culpability: burglary by unauthorized entry or burglary by unauthorized remaining. *People v. Boose*, 139 Ill. App. 3d 471, 473 (1985) (addressing burglary under section 19-1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, ¶ 19-1(a), currently codified in the Criminal Code of 2012 (720 ILCS 5/19-1(a) (West 2016))); see *People v. Acklin*, 2020 IL App (4th) 180588, ¶ 23 (same). Burglary by unauthorized remaining requires that the defendant initially entered *with* authority and later remained *without* authority. *People v. Rudd*, 2012 IL App (5th) 100528, ¶ 12 (citing *People v. Boone*, 217 Ill. App. 3d 532, 533 (1991)); see *People v. Tinkler*, 85 Ill. App. 3d 528, 530-31 (1980).

¶ 74 The pattern jury instructions on residential burglary reflect these two theories of culpability in two separate sets of instructions: IPI Criminal No. 14.13 and IPI Criminal No. 14.14 for unauthorized entry and IPI Criminal No. 14.13A (approved July 29, 2022) and IPI Criminal No. 14.14A (approved July 29, 2022) for unauthorized remaining. As to the first set, the definition instruction states that a "person commits the offense of residential burglary when he knowingly and without authority enters the dwelling place of another *** with the intent to commit therein the offense of [theft]." IPI Criminal No. 14.13. The issues instruction requires proof "[t]hat the defendant knowingly entered the dwelling place of another" and "did so without authority." IPI Criminal No. 14.14. As to the second set, the definition instruction states that a "person commits the offense of residential burglary when he knowingly enters *with authority* the dwelling place of another *** and thereafter *without authority* remains within that dwelling place *** with the intent to commit therein the offense of [theft]." (Emphases added.) IPI Criminal No. 14.13A. The issues instruction requires proof that (1) "the defendant knowingly entered the dwelling place of another ***; and" (2) "the defendant did so *with authority*; and" (3) "the defendant thereafter, *without authority*, knowingly remained within that dwelling place ***; and" (4) "the defendant remained within that dwelling place *** with the intent to commit therein the offense of [theft.]" (Emphases added.) IPI Criminal No. 14.14A.

¶ 75 In this case, the State charged defendant with residential burglary by unauthorized entry, alleging that "he, knowingly and without authority, unlawfully entered the dwelling place[s]" of Devine and Morrill. Therefore, the trial court should have given IPI Criminal Nos. 14.13 and 14.14 without modification. A trial court must use the Illinois Pattern Jury Instructions (IPIs) unless they do not accurately state the law. Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013); see *People v. Edmondson*,

2018 IL App (1st) 151381, ¶ 63 (a trial court may deviate from the IPIs only to accommodate unusual facts or changes in the law). The trial court's oral instructions correctly followed the IPIs on residential burglary by unauthorized entry. However, the written instructions modified IPI Criminal Nos. 14.13 and 14.14 by adding "or knowingly and without authority remains" to the first element of residential burglary.[4] In addition, during closing argument, the State read the issues instruction as "the defendant knowingly entered *and* remained in the dwelling place of another."[5] (Emphasis added.). In total, the jury received three different instructions as to the first element of residential burglary. The oral instructions required the State to prove that defendant entered without authority, the written instructions allowed the State to prove that defendant entered *or* remained without authority, and the State's description of the instructions required proof that defendant entered *and* remained without authority.

¶ 76    "[T]wo directly conflicting instructions on an essential element, one stating the law correctly and the other erroneously" result in a situation in which "we can never know which instruction the jury was following." *Hartfield*, 2022 IL 126729, ¶ 59. Such a scenario produces an error that compromises "the integrity of the judicial system itself" and that requires reversal under either a plain-error or harmless-error analysis. *Id.* That is exactly what happened in this case. We do not know whether the jury followed the court's oral instructions, which stated the law correctly, or the written instructions, which did not. If the jury followed the written instructions, we do not know which theory the jury used to find defendant guilty. The jury may have properly found

---

[4]The trial court's written instructions on residential burglary tracked the language of the residential burglary statute, but this case illustrates why using the IPIs is important. The IPIs clearly reflect the mutually exclusive nature of the two theories of burglary, whereas the statute does not.

[5]The State's brief repeats this incorrect description of the first element of residential burglary; it says that "[d]efendant entered *and* remained within the dwelling places of units 909 and 407 without authority." (Emphasis added.).

defendant guilty of residential burglary because he entered Devine and Morrill's units without authorization. However, the jury may have found defendant guilty simply because he remained in Devine and Morrill's units without authorization. Devine and Morrill's testimony certainly supported such a conclusion. But the State never charged that theory of residential burglary. Even if it had, a defendant cannot commit residential burglary solely by unauthorized remaining; rather, authorized entry must precede unauthorized remaining. See *Rudd*, 2012 IL App (5th) 100528, ¶ 12. Here, there was no dispute that defendant's entry into Devine and Morrill's units was *not* authorized. So, if the jury followed the written instructions and found defendant guilty because he remained inside Devine and Morrill's units without authorization, then the jury found defendant guilty of residential burglary based on a theory that Illinois law does not even recognize. The same is true if the jury followed the State's reading of the instructions and found defendant guilty because his entry *and* remaining were unauthorized.

¶ 77    Furthermore, there is a risk that the jury's seemingly unanimous verdict is actually a blend of these three theories: unauthorized entry, unauthorized remaining, and unauthorized entry followed by unauthorized remaining. Even if some jurors followed the oral instructions and properly found defendant guilty based on unauthorized entry, other jurors may have followed the written instructions or the State's suggestion and found defendant guilty based on uncharged, nonexistent theories of culpability. Altogether, the residential burglary instructions in this case are so flawed and contradictory as to create a serious risk that defendant was improperly convicted of that offense.

¶ 78    The State concedes that the written residential burglary instructions were erroneous but argues that such error was "harmless" because "it was undisputed that defendant had no authority

to enter or remain within any of the dwellings." Harmless error review does not apply here because defendant did not preserve this issue. See *People v. Thompson*, 238 Ill. 2d 598, 611 (2010) (harmless error applies to preserved issues while plain error applies to forfeited issues). Rather, plain error review, as our supreme court has defined it in the context of jury instructions, applies. See *Hartfield*, 2022 IL 126729, ¶ 50. Regardless, defendant's authority or lack thereof to remain in the units was irrelevant because the State never charged residential burglary by unauthorized remaining. Accordingly, we hold that the residential burglary instructions constitute plain error. We reverse defendant's convictions for residential burglary and remand for a new trial on those charges. See *People v. Gonzalez*, 326 Ill. App. 3d 629, 632 (2001).

¶ 79 Our reversal and remand of defendant's residential burglary convictions raises a double jeopardy issue. The double jeopardy clause of the United States Constitution prohibits the State from having a second opportunity to try the case unless the first trial presented sufficient evidence to prove the defendant guilty. *People v. Sperry*, 2020 IL App (2d) 180296, ¶ 30; see *People v. Olivera*, 164 Ill. 2d 382, 393 (1995) (the double jeopardy clause forbids a second trial to give the State another opportunity to supply evidence that it failed to introduce in the first trial.). "Thus, before remanding for a new trial, the possibility of double jeopardy requires us to rule upon the sufficiency of the evidence." See *Sperry*, 2020 IL App (2d) 180296, ¶ 30. Specifically, defendant argues that the State failed to prove him guilty of residential burglary because it did not introduce sufficient evidence of his intent to commit theft.

¶ 80 Reviewing the record *in the light most favorable to the State* (see *People v. Newton*, 2018 IL 122958, ¶ 24), we conclude that there was sufficient evidence to support the jury's conclusion that defendant intended to commit theft. Theft is knowingly obtaining or exerting unauthorized

control over the property of the owner. 720 ILCS 5/16-1(a)(1) (West 2016). There is no dispute that defendant took, used, and moved several items that did not belong to him, such as hats, a scarf, wine, a cell phone, and keys in Devine's unit and wine, a guitar, and a wallet in Morrill's unit. Additionally, multiple witnesses testified that defendant said, "I own this building," suggesting that he intended to exert control over the building and objects within it even though nothing in the building was his property. That is the definition of theft. See *id.* A rational trier of fact could have concluded that, when defendant entered Devine and Morrill's units, he intended to exert unauthorized control over items within those units, *i.e.*, to commit theft. Therefore, we find no double jeopardy issue with remanding for a new trial on the residential burglary charges. However, this conclusion will not be binding on retrial and does not express our opinion of defendant's guilt or innocence. See *Sperry*, 2020 IL App (2d) 180296, ¶ 30.

¶ 81                                    C. One-Act, One-Crime

¶ 82     Finally, defendant argues that his conviction for aggravated criminal sexual assault is a lesser included offense of home invasion predicated on criminal sexual assault, so his conviction for home invasion, as the less serious of the two offenses, should be vacated pursuant to the one-act, one-crime rule. Defendant did not raise this issue in his posttrial motion, but he seeks plain error review. Plain error review applies to potential one-act, one-crime violations. *People v. Coats*, 2018 IL 121926, ¶¶ 9-10.

¶ 83                                    1. State's Forfeiture

¶ 84     In its response brief, the State agreed that defendant's conviction for home invasion should be vacated pursuant to the one-act, one-crime rule. However, after we ordered oral argument on this issue, the State filed a motion to withdraw its concession of error and for leave to file a

supplemental brief, which we granted. The State now argues that no one-act, one-crime violation occurred because aggravated criminal sexual assault is not a lesser included offense of home invasion predicated on criminal sexual assault. We also allowed defendant to file a supplemental brief, in which he argues that we should hold the State to its original concession of error.

¶ 85    Defendant is correct that the State forfeited its current position by not raising that argument in its brief. See *People v. Ward*, 2023 IL App (1st) 190364, ¶ 122 (citing Ill. S. Ct. R. 341(h)(7) (eff. Oct 1, 2020)). However, forfeiture only binds the parties, not the reviewing court. *People v. Melvin*, 2023 IL App (4th) 220405, ¶ 11. The State's initial failure to recognize that defendant's convictions for home invasion and aggravated criminal sexual assault may not constitute a one-act, one-crime violation does not automatically preclude us from considering that issue.

¶ 86    Moreover, whether a one-act, one-crime violation occurred is a question of law we review *de novo*. *People v. Scott*, 2015 IL App (1st) 133180, ¶ 14. We review the trial court's judgment, not its reasoning, and we can affirm on any basis supported by the record. *People v. Betance-Lopez*, 2015 IL App (2d) 130521, ¶ 60. As we will explain below, we affirm defendant's multiple convictions based on the charging documents and the jury instructions, which are included in the record on appeal.

¶ 87    Defendant cites *Jackson v. Board of Election Commissioners of Chicago*, 2012 IL 111928, ¶ 33, for the principle that a reviewing court can override forfeiture only "in the interests of achieving a just result and maintaining a sound and uniform body of precedent." In this case, we overlook the State's forfeiture of this issue to achieve a just result. The just result here is upholding a jury verdict that properly found defendant guilty of both aggravated criminal sexual assault and home invasion. An unjust result would be allowing defendant to escape accountability for one of

these serious crimes simply because of the State's oversight in briefing this appeal. We are also compelled to provide guidance on why aggravated criminal sexual assault is not a lesser included offense of home invasion predicated on criminal sexual assault because little if any Illinois authority squarely addresses that issue. Accordingly, we will consider the one-act, one-crime issue on the merits.

¶ 88                                   2. Lesser Included Offense

¶ 89    The one-act, one-crime rule provides that a defendant cannot be convicted of multiple offenses based on the same physical act. *People v. Reveles-Cordova*, 2020 IL 124797, ¶ 12 (citing *People v. King*, 66 Ill. 2d 551, 566 (1977)). The rule also prohibits multiple convictions when the offenses are based on separate acts but one offense is a lesser included offense of the other. *People v. Miller*, 238 Ill. 2d 161, 165 (2010). The one-act, one-crime rule requires a two-step analysis. *Reveles-Cordova*, 2020 IL 124797, ¶ 12. First, we determine whether the defendant's conduct involved multiple acts or a single act. *Id.* If the conduct involved multiple acts, we must determine whether one offense is a lesser included offense of the other. *Id.* We review potential violations of the one-act, one-crime rule *de novo*. *Coats*, 2018 IL 121926, ¶ 12. Defendant raises only the second part of the one-act, one-crime analysis, arguing that his convictions for aggravated criminal sexual assault are lesser included offenses of home invasion predicated on criminal sexual assault. He contends that the home invasion conviction should be vacated because it is the less serious offense.

¶ 90    Defendant was convicted of two counts of aggravated criminal sexual assault predicated on bodily harm (720 ILCS 5/11-1.30(a)(2) (West 2016)) and one count of home invasion predicated on "criminal sexual assault against T.F." (*id.* § 19-6(a)(6)). To determine whether one offense is a lesser included offense of another, we use the "abstract elements" test. *Reveles-*

*Cordova*, 2020 IL 124797, ¶ 13. Under this approach, we examine the statutory elements of the two offenses. *Id.* "If all of the elements of one offense are included within a second offense and the first offense contains no element not included in the second offense, the first offense is deemed a lesser-included offense of the second." (Internal quotation marks omitted.) *Id.* It must be impossible to commit the greater offense without committing the lesser offense. *Id.*

¶ 91    A defendant commits home invasion when he knowingly and without authority enters the dwelling place of another, has reason to know that one or more persons are present, and engages in one of six predicate acts. 720 ILCS 5/19-6(a)(1)-(6) (West 2016). The predicate acts include using force or threatening to use force while armed with a firearm or other dangerous weapon (*id.* § 19-6(a)(1), (3)), intentionally causing injury (*id.* § 19-6(a)(2)), using force or threatening to use force and discharging a firearm (*id.* § 19-6(a)(4)), personally discharging a firearm that proximately causes great bodily harm (*id.* § 19-6(a)(5)), and, relevant here, committing one of five listed sexual offenses (*id.* § 19-6(a)(6)). The predicate sexual offenses under subsection (a)(6) are criminal sexual assault (*id.* § 11-1.20), aggravated criminal sexual assault (*id.* § 11-1.30), predatory criminal sexual assault of a child (*id.* § 11-1.40), criminal sexual abuse (*id.* § 11-1.50), and aggravated criminal sexual abuse (*id.* § 11-1.60). *Id.* § 19-6(a)(6). In this case, the indictment did not specify a predicate offense for home invasion by statutory number, but it stated that the predicate offense was "criminal sexual assault." The jury instructions on home invasion said the same thing. We interpret this language to mean that the predicate offense for home invasion was criminal sexual assault under section 11-1.20 as opposed to aggravated criminal sexual assault under section 11-1.30. Relevant here, a defendant commits criminal sexual assault when he commits an act of sexual penetration and uses force or threat of force. *Id.* § 11.20(a)(1). A

defendant commits aggravated criminal sexual assault when he commits criminal sexual assault and causes bodily harm to the victim. *Id.* § 11-1.30(a)(2).

¶ 92    The issue is whether, for purposes of the abstract elements test, the third element of home invasion is the commission of *any* of the five sex offenses listed in subsection (a)(6) or the commission of the specific sex offense identified by the State as the predicate. Our supreme court addressed a version of this question in *Reveles-Cordova*. In that case, the court analyzed how to apply the abstract elements test when the defendant was convicted of both criminal sexual assault and home invasion predicated on criminal sexual assault. *Reveles-Cordova*, 2020 IL 124797, ¶¶ 1, 14. The court held:

> "Proof of criminal sexual assault is a necessary element of proof of home invasion predicated on criminal sexual assault. All the elements of criminal sexual assault are included in the offense of home invasion predicated on criminal sexual assault, and criminal sexual assault contains no element not included in home invasion. It is impossible to commit home invasion predicated upon criminal sexual assault without committing criminal sexual assault. As such, criminal sexual assault is a lesser-included offense of home invasion." *Id.* ¶ 21.

¶ 93    Applying the holding of *Reveles-Cordova* to this case, the question is whether all the *elements* of aggravated criminal sexual assault are included in the offense of home invasion predicated on criminal sexual assault. See *id.* We find that they are not. Home invasion predicated on criminal sexual assault under section 11-1.20 does not include the element of bodily harm present in aggravated criminal sexual assault under section 11-1.30(a)(2). It is possible to commit home invasion predicated on criminal sexual assault without committing aggravated criminal

sexual assault. For example, if the jury found that defendant sexually assaulted T.F. but did not cause bodily harm, it could acquit defendant of aggravated criminal sexual assault but still find him guilty of home invasion predicated on criminal sexual assault. Therefore, under the abstract elements test, defendant's convictions for aggravated criminal sexual assault are not lesser included offenses of home invasion predicated on "simple" criminal sexual assault.

¶ 94 Defendant argues that "pars[ing] among the different offenses enumerated in subsection (a)(6) to avoid merger would have absurd, unfair consequences that the legislature could not have intended." But "parsing" is exactly what our supreme court requires: "the five sex offenses identified in subsection (a)(6) should be construed as separately proscribed offenses." *Id.* ¶ 20.

¶ 95 This case is not, as defendant contends, like *People v. Richardson*, 2022 IL App (1st) 191689-U.[6] In *Richardson*, the defendant was convicted of aggravated criminal sexual assault predicated on committing criminal sexual assault during a home invasion (720 ILCS 5/11-1.30(a)(4) (West Supp. 2011)) as well as home invasion predicated on criminal sexual assault (720 ILCS 5/12-11(a)(6) (West 2010)).[7] *Richardson*, 2022 IL App (1st) 191689-U, ¶¶ 15-16. This court concluded that the defendant's convictions violated the one-act, one-crime rule because, under those facts, "it is impossible to commit aggravated criminal sexual assault predicated on home invasion without committing home invasion and impossible to commit home invasion predicated on criminal sexual assault without committing aggravated criminal sexual assault." *Id.* ¶ 17. By contrast, in this case, defendant's convictions for aggravated criminal sexual assault were not

---

[6]Although *Richardson* is an unpublished order under Rule 23, defendant properly cites it as persuasive authority because it was issued after January 1, 2021. See Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023).

[7]In 2013, the home invasion statute was renumbered from section 12-11 to section 19-6. See 720 ILCS 5/12-11 (West 2010); 720 ILCS 5/19-6 (West 2012).

predicated on home invasion, and defendant could have committed home invasion without committing aggravated criminal sexual assault. If defendant had sexually assaulted T.F. without causing bodily harm, he would be guilty of home invasion predicated on criminal sexual assault but not guilty of aggravated criminal sexual assault. That is, defendant's commission of aggravated criminal sexual assault was not necessary to his commission of home invasion predicated on criminal sexual assault. Therefore, aggravated criminal sexual assault is not a lesser included offense of home invasion in this case.

¶ 96    Finally, defendant argues that this approach to the lesser included offense analysis results in defendant being subject to a *greater* penalty—convictions for both aggravated criminal sexual assault and home invasion—solely because the State charged a *lesser* offense, "simple" criminal sexual assault, as the predicate for home invasion. That is, had the State charged home invasion predicated on aggravated criminal sexual assault instead of "simple" criminal sexual assault, the convictions would have merged. That may be true, but it is up to the legislature to address that issue if it wishes to do so. We must apply the criminal statutes as written and the abstract elements test as our supreme court instructed in *Reveles-Cordova*. We also note that the State has wide discretion in charging defendants (*People v. Perry*, 224 Ill. 2d 312, 339 (2007)) and is entitled to charge strategically to avoid merger of convictions under the one-act, one crime rule. Accordingly, we affirm defendant's separate convictions for home invasion and aggravated criminal sexual assault.

¶ 97                                    III. CONCLUSION

¶ 98    For the foregoing reasons, we affirm defendant's convictions for aggravated criminal sexual assault and home invasion. We reverse defendant's convictions for residential burglary and remand for a new trial on those charges.

¶ 99    Affirmed in part and reversed in part; cause remanded.

---

### *People v. Allen*, **2024 IL App (1st) 221681**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 17-CR-16663, 17-CR-16664, 17-CR-16665; the Hon. Charles P. Burns, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Jonathan Yeasting, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Mary L. Boland, John E. Nowak, and Beth Pfeiffer Burns, Assistant State's Attorneys, of counsel), for the People. |

---