THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
HERBERT PERKINS, JR., Defendant-Appellant.
First District (2nd Division)   No. 1—88—1245

Opinion filed June 28, 1991.

Randolph N. Stone, Public Defender, of Chicago (Henry L. Hams and Donald S. Honchell, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Herbert Perkins, Jr., appeals after a bench trial from his convictions on two counts of aggravated criminal sexual assault (causing bodily harm), two counts of aggravated criminal sexual assault (endangering life), two counts of aggravated criminal sexual assault (during commission of a felony) and three counts of aggravated criminal sexual assault (victim at least 60 years of age) against Margaret Webster (Margaret), claiming that the indictments did not allege the charges against him with sufficient specificity and that he was denied a fair trial by the improper admittance of hearsay testimony. He seeks reversal of his convictions or reversal with a remand for a new trial.

Tanya Webster (Tanya), Margaret's daughter, testified at trial that she lived with Margaret at the time of the incident; Perkins was Tanya's boyfriend at the time. On September 12, 1985, Tanya and a friend went to Missouri for the weekend, and she told Perkins over the phone on September 13 that she was going out of town. Later that day, Tanya received a phone call in Missouri from Annette Jones (Jones), who lived below her and Margaret's apartment. Tanya immediately returned home. She saw Perkins' car in front of the house, and found the apartment to be in great disorder, with blood in the

dining room, living room, bedroom and kitchen, a chandelier pulled out of the ceiling, an air conditioner pulled out of the window, a broken lamp, a fist-sized hole in a wall, and substantial damage to the kitchen. Upon visiting her mother in the hospital, Tanya found her to have patches over her eyes, scars on, and swelling in, her face, and bandages and pads on her thigh and buttocks. Margaret died in the hospital.

Jones testified that she knew Perkins because of his relationship with Tanya. She saw Margaret on the morning of September 13, 1985, and she appeared to be in good health. Late that night, however, Jones awakened to the sound of fighting in the upstairs apartment, mostly from the kitchen. She recognized Perkins' voice saying, "Where's the bitch at?" She also heard him yell the names of several men, and heard him say, "I am going to take you to Jackson Park [a local hospital] bitch, you're going to Jackson Park tonight." Jones heard Margaret yell for help. She phoned Margaret's apartment and asked her whether everything was alright. She replied, "No." Jones called the police, ran upstairs and knocked at Margaret's door. Her knock went unacknowledged, but she again heard Perkins yell that he was "going to take you to Jackson Park," and heard Margaret shouting for help.

Jones entered Margaret's apartment after the police arrived. She first saw Margaret standing in the dining room and leaning over a table, naked, with her hair full of shampoo and with blood emanating from her rectum. She saw that Perkins was naked and had blood on his penis, that there was a puddle of blood in the dining room, and later, when she saw Margaret get up from her bed, there was blood on the bed. She saw no open wounds on Margaret's body, however.

Chicago police officer James Kennelay arrived with his partner, Susan Urbon, at Margaret's apartment at about 12:45 on the morning of September 14, 1985, in response to a call. When he and Urbon reached the building, he heard loud voices coming from the second floor and could hear objects being thrown about. About a minute after the officers knocked on the door, which, because it opened outward, could not easily be broken into, Margaret answered the door, naked, with soap in her hair, blood running down her legs, apparently from her vagina and rectum, and moaning for the officers to help her.

Perkins was standing approximately 10 feet behind Margaret. He was naked, had soap in his hair, blood on his genitalia, and was yelling incomprehensibly, although he did not appear to be injured. When Kennelay attempted to subdue him, Perkins initially eluded his grasp and threw an air conditioning unit out the window, before finally be-

ing handcuffed. The apartment was in complete disarray, with clothes, garbage and broken items strewn throughout and a window (other than the one through which the air conditioner had been ejected) was knocked out.

Urbon testified that when she and Kennelay entered Margaret's apartment, Margaret ran from the living room into her bedroom. While in the bedroom with the victim, Urbon noticed that blood was coming from her rectum, that she was shaking and appeared frightened, and that she had a bite mark on her right thigh, which was bleeding. Urbon asked Margaret whether she had been raped, and although Margaret responded, that response does not appear in the record.

About 10 minutes after they arrived, the officers took Margaret from the apartment and put her in a squad car. When they asked her what had happened, Margaret replied that Perkins had called and was looking for her daughter, that he had come by the apartment and had asked whether he could use the bathroom to take a bath, that he had ripped her clothes off and had raped her. Urbon testified that Margaret's statements were prompted solely by her and Kennelay's questions.

John Kenney, an expert in the field of bite mark identification, testified that after Margaret's death on October 6, 1985, he examined three bite marks on her body. He compared the marks, which were on her thigh and breast, with models taken of Perkins' teeth, and concluded that Perkins had made the marks and that the bite on Margaret's thigh would have to have been made with a great deal of force.

Albert Sheetz, an expert in the field of general surgery, testified that he treated Margaret when she arrived at the hospital following the incident. During his initial conversation with her on the morning of September 14, 1985, she told him that "she had been sexually assaulted by her daughter's boyfriend." Margaret's rectum was badly traumatized, lacerated, bleeding and swollen. While Sheetz could not identify with any certainty the cause of the injury, he testified that it could have been caused by multiple violent intrusions. In addition, Margaret's vagina was lacerated, swollen and bruised, with some minor bleeding, and the doctor stated that the injury could have been caused by the forceful insertion of a penis or other object.

On cross-examination, Sheetz stated that he had related Margaret's own words when he testified that she said she had been sexually assaulted, but then stated that she may have said that she had been raped.

Peter Dignan, a Chicago police officer, testified that he interviewed Perkins immediately after his arrest. Perkins told him that he had called Margaret's home at around 8 p.m. on September 13, 1985, in order to speak to Tanya, but was told that she was not there. He then told Margaret that he was coming over, and purchased some beer and wine before going to the apartment. He and Margaret conversed, after which he told her that he had to leave in order to be somewhere by 4 in the morning. Margaret told him that he could stay if he wanted to, take a bath, and leave from the apartment.

As Perkins was bathing, however, Margaret entered the bathroom, threw her cat into the tub with him, starting yelling something about the "Holy Ghost" and threw soap into his eyes. They began to fight. Perkins told Dignan that he threw objects about in order to stop Margaret and that he also bit her on the thigh during the fracas, but denied having sexual intercourse with her.

Dignan also testified that he spent between 40 and 45 minutes at Margaret's apartment early in the morning of September 14, 1985, and observed no empty alcohol containers; he admitted, however, that his failure to observe them did not mean they weren't there.

Perkins did not present a defense. Following conviction (and acquittal on several counts not at issue in this appeal), the court sentenced him to nine concurrent sentences of 20 years in the custody of the Illinois Department of Corrections.

Perkins first contends that his indictments for aggravated criminal sexual assault failed to "set[ ] forth the nature and elements of the offense charged," as required by section 111—3(a)(3) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 111—3(a)(3)). Specifically, Perkins claims that the indictments, which accused him of committing "an act of sexual penetration, to wit: sexual [in some counts, 'anal'] intercourse upon Margaret Webster by the use of force and by the threat of force," failed to sufficiently describe "sexual penetration." He points out that "sexual penetration" is defined by section 12—12(f) of the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(f)) as:

> "any contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration."

Because, Perkins argues, a variety of acts can constitute "sexual penetration," the indictments should have listed the type of act which

was allegedly committed with more specificity than "sexual intercourse" or "anal intercourse." Accordingly, Perkins maintains, the circuit court should have granted his motion to dismiss the charges.

▪▪ In order to be sufficiently specific, an indictment must

"apprise the defendant with reasonable certainty of the offense with which he is charged, so that he will be able to prepare a defense and plead any acquittal or conviction which results as a bar to future prosecutions." (*People v. Hall* (1982), 96 Ill. 2d 315, 320.)

When an illegal act may be committed in more than one way, Perkins avers, the indictment should specify the manner in which the crime was allegedly committed. Criminal sexual assault, which is a crime predicate to a conviction for aggravated criminal sexual assault (see section 12—14(a) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)), is committed if one:

"(1) commits an act of sexual penetration by the use of force or threat of force; or

(2) commits an act of sexual penetration and the accused knew that the victim was unable to understand the nature of the act or was unable to give knowing consent; or

(3) commits an act of sexual penetration with a victim who was under 18 years of age when the act was committed and the accused was a family member." (Ill. Rev. Stat. 1985, ch. 38, par. 12—13(a).)

Perkins' indictments all accused him of committing "an act of sexual penetration *** by the use of force and by the threat of force," consistent with the manner by which criminal sexual assault can be committed according to section 12—14(a)(1) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(1)).

The cases Perkins cites to buttress his argument that the indictments should have been more specific than to merely allege one of the three methods of criminal sexual assault do not support his claim. In *People v. Lutz* (1978), 73 Ill. 2d 204, the court held that an indictment for aggravated battery (use of deadly weapon) (section 12—4(b)(1) of the Code (Ill. Rev. Stat. 1973, ch. 38, par. 12—4(b)(1))) must allege which of the two methods by which the predicate act of battery (section 12—3(a) of the Code (Ill. Rev. Stat. 1973, ch. 38, par. 12—3(a))) can be committed were used by the defendant. (73 Ill. 2d at 212.) Because, unlike "sexual penetration," neither of the two battery methods was more specifically defined by statute, *Lutz* is not helpful in determining the level of specificity required in the instant case.

The court in *People v. Heard* (1970), 47 Ill. 2d 501, held a complaint to be deficient which charged two defendants with gambling (policy game) (section 28—1(a)(8) of the Code (Ill. Rev. Stat. 1967, ch. 38, par. 28—1(a)(8))) by alleging that each

"set up or promoted a Policy Game or (Sold) or (Offered to Sell) or (transferred) a ticket or (share) for a lottery or (sold) or (offered to sell) or (transferred) or (knowingly possessed) a policy ticket or other similar device: To Wit: Policy results tickets, Policy bet writings and other related gambling policy paraphernalia." (47 Ill. 2d at 504.)

Although the indictment tracked the statute's language, the court held that it was too general because:

"the statute names disparate and alternative acts, any one of which will constitute the offense. *** The promoting of a policy game is not the same act as transferring a policy ticket, for example. The use of the disjunctive under these circumstances causes uncertainty and conjecture as to which of the alternatives the accused is charged with committing." 47 Ill. 2d at 504.

The court, however, required only that the State choose which elements of the crime it was going to charge the defendant with. Even though "policy game," one of those elements, was itself defined in alternative ways in section 28—2(c) of the Code (Ill. Rev. Stat. 1967, ch. 38, par. 28—2(c)), the court did not discuss whether the State needed to select a definition from among those mentioned in the statute. As with *Lutz*, the decision in *Heard* does not show that the State, when charging a crime, has to provide more specificity than that provided by the statute allegedly violated, even if terms within that statute are more specifically defined elsewhere.

■ In *Hall*, however, the court held that an indictment charging the defendant with violating the Cannabis Control Act (Ill. Rev. Stat. 1977, ch. 56½, par. 701 *et seq.*) was sufficiently specific when it charged that he "knowingly and unlawfully possessed, with intent to deliver *** cannabis" (96 Ill. 2d at 317), although the terms "manufacture," "deliver" and "Cannabis" were defined in alternative and disparate ways in section 3 of that Act. (Ill. Rev. Stat. 1977, ch. 56½, pars. 703(a), (d), (h).) Similarly, although several different acts constitute "sexual penetration" according to section 12—12(f) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(f)), the State was not required to allege which part of the definition addressed Perkins' actions; the identification of "sexual penetration" as an element the State was required to prove, combined with the indictments' description of the

penetration as being "sexual intercourse" and "anal intercourse," properly "protect[ed] the defendant against being forced to speculate as to the nature or elements of the *** offense, thus spreading his resources thin, attempting to rebut all of the possibilities, while the prosecutor merely focuses on the most promising alternative and builds his case around that." *Hall*, 96 Ill. 2d at 320.

Perkins next argues that the trial court abused its discretion in admitting Susan Urbon's testimony that after she and Kennelay put Margaret in a squad car to take her to the hospital, they asked her what had happened, which elicited her reply that Perkins had raped her. He argues that this testimony was inadmissible hearsay, violative of his right "to be confronted with the witnesses against him" (U.S. Const., amend. VI) and of his right "to meet the witnesses face to face" (Ill. Const. 1970, art. I, §8), and was further inadmissible as a "spontaneous declaration" because Urbon had, while in the apartment with Margaret, already asked her whether she had been raped; Margaret had therefore had time to reflect on the "suggestion" raised by Urbon's question, thus negating any spontaneity to her statement in the squad car.

■ In order to qualify as a "spontaneous declaration," and thus to except it from the hearsay rule, there must, in addition to other factors not relevant to this case, be an "absence of time to fabricate" the statement. (*People v. House* (1990), 141 Ill. 2d 323, 381.) In considering the impact of this requirement on a statement, courts consider not just the amount of time involved, but also "the nature of the event, the mental and physical condition of the declarant, and the presence or absence of self-interest." *House*, 141 Ill. 2d at 382.

Ten minutes elapsed from the time the police officers interrupted the events at Margaret's residence by their arrival until she made her statement. There was evidence, as previously noted, that when the police officers reached her apartment, Margaret was shaking and frightened, and was bleeding both from her rectum and from the bite mark on her thigh. The only event which Perkins alleges affected the spontaneity of Margaret's statements was Urbon's question to her as to whether she had been raped, the answer to which does not appear in the record, but which, according to Perkins, "was an unduly suggestive and conclusory question," and which caused the admitted statement to lack spontaneity "because the circumstances under which it was made showed that [Margaret] Webster had time to reflect on events that had occurred, think about the question Officer Urbon asked her in the apartment and organize her anticipated response in her mind before speaking to Urbon and Kennelay."

■■ ■ We first note that the spontaneity of a declaration is not destroyed by the declarant's having spoken to someone on a topic before making the admitted statement on the same subject; the earlier statement "is merely a factor to consider in determining admissibility." (*House*, 141 Ill. 2d at 386.) In addition, other cases have held statements to be spontaneous even when they were made several minutes after the startling occurrence, provided that the other requirements for spontaneity were met. (See, *e.g., People v. Sanchez* (1982), 105 Ill. App. 3d 488, 491-92 (statement made 45 minutes after declarant was shot, after having twice previously identified the perpetrator to others, and in response to a question about who the perpetrator was); *People v. Washington* (1984), 127 Ill. App. 3d 365, 385 (time between incident and statement was 10 minutes, during which period the declarant made a telephone call and ascended a flight of stairs); *People v. Wilson* (1980), 87 Ill. App. 3d 693, 701-02 (witness was first person to whom declarant spoke, 15 to 20 minutes after being beaten and raped; declarant was injured, was crying and had walked about half a block before making statement).) Considering Margaret's physical and emotional condition at the time she made the statement, the apparent violence occurring in the apartment before the arrival of the police, and the absence of evidence of any self-interest on Margaret's part in accusing Perkins of rape, we hold that the passage of 10 minutes after the event and Officer Urbon's prior question to Margaret did not destroy the spontaneity of her statement in the squad car. Accordingly, the admission of that statement was not an abuse of the trial court's discretion.

Finally, Perkins contends that the trial court abused its discretion in admitting Doctor Sheetz's testimony that Margaret had told him that she had been "sexually assaulted by her daughter's boyfriend," arguing that the statement was hearsay not made admissible as a statement made to a physician for the purposes of treatment, since Sheetz had no need to know the identity of the person who sexually assaulted Margaret in order to treat her properly. The State responds by avoiding the question of the admissibility of Margaret's identification of Perkins as the perpetrator, defending, instead, the admissibility of her statement that she had been sexually assaulted.

■■ While there is no question that Margaret's statement that she had been sexually assaulted was admissible as a "statement[ ] pertinent to medical diagnosis and treatment" (*People v. Sommerville* (1990), 193 Ill. App. 3d 161, 175-76; *People v. Taylor* (1987), 153 Ill. App. 3d 710, 720), that part of her statement identifying Perkins as the perpetrator was not admissible under this exception to the hear-

say rule. (*Sommerville*, 193 Ill. App. 3d at 175-76; *Taylor*, 153 Ill. App. 3d at 721.) Nevertheless, since identification of the perpetrator was clearly not an issue in the instant case, the improper admission of that part of Margaret's testimony so identifying Perkins was clearly harmless error.

For all of the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN and DiVITO, JJ., concur.