2025 IL App (1st) 230676-U

No. 1-23-0676

Order filed March 10, 2025.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 14844 |
| | ) | |
| JEFFREY CROWDER, | ) | The Honorable |
| | ) | Michael R. Clancy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: We vacate defendant's conviction for false personation of a peace officer as it violates the one-act, one-crime doctrine. We otherwise affirm the judgment of the circuit court where the trial court properly allowed the victim's hearsay statements made after the incident as excited utterances, and where the court properly allowed evidence relevant to show defendant's identity as the offender.

¶ 2    Following a jury trial, defendant Jeffrey Crowder was convicted of the attempted aggravated criminal sexual assault of K.W. and the false personation of a peace officer. On appeal, defendant asserts that the trial court erroneously admitted evidence of K.W.'s hearsay statements

following the assault under the excited utterance exception to the rule prohibiting hearsay evidence. Defendant also asserts that the court erroneously admitted irrelevant, other-crimes evidence insinuating that he had a propensity for, and practice of, falsely personating a police officer. Finally, the parties agree that defendant's convictions violate the one-act, one-crime doctrine. We vacate defendant's conviction for personation of a peace officer and affirm the trial court's judgment in all other respects.

¶ 3                                  I. Background

¶ 4                                  A. Pretrial

¶ 5     Before trial, the State filed a motion *in limine* seeking to present the jury with hearsay statements under the excited utterance exception, namely, statements K.W. made to her boyfriend Robert Woods 30 minutes after the alleged assault. Defendant asserted that the exception did not apply because K.W. had sufficient time to fabricate the statements and spoke to at least two people between the incident and making the hearsay statements. Defendant also argued that K.W. had a motive to fabricate the incident because Woods was K.W.'s pimp, and K.W. needed an excuse for not having Woods's money. Following argument, the trial court granted the State's motion, finding that K.W. lacked the opportunity to fabricate her account.

¶ 6     Defendant also asked the trial court to exclude any evidence regarding a police badge that was found in defendant's car, as the victim denied seeing a badge during the assault. In response, the State argued that the badge was relevant because it corroborated the evidence that defendant told the victim he was a police officer and "does pose as a peace officer." Defendant argued, however, that this was "a back door attempt to get in proof of other crimes," and the evidence's prejudicial value outweighed the probative value. The court ruled that evidence concerning the

badge would be admissible, as long as there was "nothing tying [defendant] to the stealing of the badge" and the State was not "filing a proof of other crimes."

¶ 7                                           B. Trial

¶ 8      At trial, K.W. testified that in the early morning of September 22, 2019, she was acting as a sex worker in the area of Polk Street and Kilpatrick Avenue. Her boyfriend, Robert Woods, accompanied her for protection due to recent robberies in the area. At that time, K.W. was 24 years old and Woods was 47 years old. Woods had not worked in six months.

¶ 9      Just before 7 a.m., K.W. was approached by defendant, who was driving a black Chevrolet Malibu with no other occupants. K.W. described defendant as male, black, with a "low" haircut, between 35 and 38 years old, and wearing blue shorts and a blue shirt. He appeared to be tall and "built" and to weigh between 250 and 300 pounds. K.W. had seen defendant before but did not know his name.

¶ 10     Defendant asked K.W. if she was "looking to make any money" and offered her $80. K.W. walked away to speak with Woods. Defendant then drove up to her again and repeated the offer. K.W. accepted the $80 in exchange for oral sex and got into the front passenger's seat of the Malibu. K.W. clarified on cross-examination that Woods did not direct her to accept the offer.

¶ 11     Defendant drove K.W. to a convenience store, where she bought condoms. He then drove her to an alley behind an abandoned building, which was a 5-to-10-minute drive from where he had picked her up. Defendant asked K.W. to get in the backseat, but K.W. first asked for the money up front. Defendant "flashed" money but put it back in his pocket and said he would pay her.

¶ 12     Defendant and K.W. got in the backseat. Defendant pulled out his "private area" and put on a condom with his right hand. K.W. was not paying attention to whether he had tattoos but,

upon looking at defendant in court, acknowledged that his right hand had tattoos. Defendant asked K.W. to give him oral sex. K.W. began to perform oral sex when defendant asked, "bitch, do you know what it feels like to be raped?" K.W. became uncomfortable and "immediately" stopped. Defendant grabbed her braids with one hand and pulled her head toward his groin, but K.W. pulled back before her head reached his groin. Defendant said that he was a police officer but did not "let his line of work get into what he do." He reached into the driver's side back seat, retrieved a black semi-automatic gun in his left hand, and pointed it at her.

¶ 13     K.W. was "scared for [her] life" because she had been shot before and did not want to be shot again. She saw that one of the Malibu's back doors was unlocked. She took mace out of her pocket, sprayed it, and opened the door. K.W. was not sure if she sprayed the mace directly at defendant. At that point, she was approximately 20 blocks from where she left Woods, and she ran "as fast as [she] could." K.W. wanted to return to Woods before calling the police. As she ran, she saw defendant standing by the open trunk of the Malibu holding a walkie-talkie.

¶ 14     When K.W. reached Washington Boulevard, she asked a woman for help. The woman gave K.W. some unspecified assistance. K.W. then walked a block to Madison Street, where someone she knew appeared and drove her to a BP gas station near Cicero Avenue and Polk. From there, she walked one block to Woods's location and immediately told Woods what had happened. She clarified on cross-examination that she told Woods she "was almost raped and kidnapped," but did not mention money.

¶ 15     K.W. and Woods walked back to the BP gas station. K.W. called the police from her cellphone. When the police arrived, she told them what happened and described defendant and his car. She also told them that she thought defendant worked for the Chicago Police Department,

based on what defendant told her. When the police asked K.W. whether defendant had tattoos, she told them she could not recall.

¶ 16    On September 26, 2019, K.W. shared her account with Detective John McNichols and investigator Andrea Kirsten at the Civilian Office of Police Accountability (COPA). K.W. stated on cross-examination that she described the offender to COPA and said he drove a black Chevrolet Malibu with a license plate number beginning with "AY." K.W. could not recall saying that she had heard police traffic coming from the offender's walkie-talkie when she ran from the Malibu. When K.W. spoke to COPA, she was sure that the offender was a police officer.

¶ 17    A few days later, K.W. saw defendant in a blue Chevrolet Malibu at the BP gas station. She got a "good look" at him because "[h]e made sure that [she] saw him and that he saw [her]." She sent the blue Malibu's license plate number to Detective McNichols. Shortly thereafter, K.W. identified defendant from a photo array. K.W. clarified on cross-examination that the blue Malibu was the same make and model as the black Malibu she saw on the night of the incident but had a different color and license plate number.

¶ 18    On October 8, 2019, Detective McNichols showed K.W. a black handgun at the police station. She recognized it as the same gun defendant pointed at her. Detective McNichols also showed K.W. the blue Malibu that she had seen at the gas station following the assault.

¶ 19    A surveillance camera from a church at the corner of Kilpatrick and Polk had captured the events of September 22, 2019. Videos captured by the camera were published to the jury. K.W. testified that one video captured in the morning showed K.W. returning from the BP gas station to Woods after being dropped off after the incident. We have viewed the video, which is in the record on appeal. In the video, Woods is sitting down on a bench by a sidewalk when K.W. swiftly

approaches him from around the corner and appears to speak to Woods in an upset demeanor while waving and pointing her arms. K.W. testified that, at that point, she was upset and telling Woods "what just had happened, the incident." She stated that the video then shows K.W. and Woods walking in the direction of the BP station to call the police.

¶ 20    K.W. acknowledged on cross-examination that later, in February 2021, she punched Woods and he punched her back. However, they never had any other altercations and were still in a relationship.

¶ 21    The parties stipulated that, on the date of the incident, when a responding officer asked K.W. whether the offender had tattoos, K.W. responded, "I didn't notice any tattoos." The officer's body-worn camera captured the conversation.

¶ 22    Woods testified that K.W. worked at a staffing agency. A few months prior to the incident, he learned that K.W. also did sex work. In September 2019, Woods was also working for a staffing agency but had not received work in a while. He had two convictions from 2012 and 2015 for possession of a controlled substance. A day or two before the incident, Woods started accompanying K.W. for protection because she and her friends were concerned about "some guys" who were robbing people and making them "do things they didn't want to do."

¶ 23    On the day in question, at about 7 a.m., a dark-colored Chevrolet sedan pulled up. The front windshield of the sedan was not tinted, and Woods could see the driver, whom he identified in court as defendant. After speaking with defendant twice, K.W. got in the front passenger's seat. When asked on cross-examination whether he understood that K.W. was going to perform sexual services, Woods responded that he did not know what they were doing and was not concerned. Woods stayed where he was and read the paper.

¶ 24   Thirty to thirty-five minutes later, K.W. returned on foot. She appeared scared, angry, and erratic, as if something had happened to her. She told Woods that defendant said he was an officer, had a handgun, and "tried to make her suck his dick and have sex with him." She also said that defendant "got aggressive" with K.W. and pulled her hair and arms. Woods and K.W. walked to the gas station. Meanwhile, K.W. called the police.

¶ 25   On cross-examination, Woods testified that in February 2021, he had a confrontation with K.W. in a motel and punched K.W.'s face. He denied that K.W. was having "dates" in that motel.

¶ 26   Detective McNichols testified that on September 22, 2019, he was assigned to investigate this case. He received a description of the offender and the car used to pick up K.W. Detective McNichols learned that the offender might have been a police officer, and COPA became involved. On September 26, 2019, Detective McNichols and COPA personnel took K.W.'s statement.

¶ 27   On September 28, 2019, Detective McNichols learned that K.W. saw the offender again, this time in a blue, rather than black, Chevrolet Malibu. K.W. had relayed the license plate number, which was registered to defendant. Detective Nichols learned that defendant was not a police officer and compiled a photo array that included his photo. Before an independent administrator, K.W. identified defendant from the photo array as the person who tried to sexually assault her. On October 7, 2019, defendant was taken into custody.

¶ 28   Detective McNichols interviewed defendant in the presence of Detective Connolly. Defendant initially denied being near Kilpatrick and Polk on the morning in question but, after being told a surveillance video showed his car there, he admitted to being in the area. He stated he was "just driving around" but did not pick anyone up. When shown K.W.'s photograph, defendant denied knowing her or that she had been in his car. A search of defendant's blue Chevrolet Malibu

revealed an active Summit Police badge, a brown BB gun, and a black BB gun. Detective McNichols identified the BB guns and a photograph of the police badge in court. The detective also identified a photograph of a Fraternal Order of Police (FOP) sticker on defendant's windshield and explained that those stickers were given to officers to be placed on their personal vehicles.

¶ 29    When Detective McNichols interviewed defendant again on October 8, 2019, defendant acknowledged that the BB guns had been in his trunk. He said that he had found the police badge on the floor at a Walmart. Later that day, K.W. identified the black BB gun as the gun that defendant used in the incident. She also identified defendant's blue Malibu as the vehicle she saw him in at the gas station after the incident.

¶ 30    On cross-examination, Detective McNichols acknowledged that K.W. said the BB gun "resembled" the gun that defendant used during the incident but she did not know it had been a BB gun. He also acknowledged that K.W. did not report seeing a police badge during the assault. He could not recall if he searched the police database to determine whether defendant was affiliated with a black Chevrolet Malibu.

¶ 31    Detective Antonio Herrera testified that when he went to arrest defendant at his workplace in Addison, Illinois, he saw a blue Chevrolet Malibu that had been associated with defendant in the police database. The detective did not recall a black Malibu being registered to defendant.

¶ 32    The jury found defendant guilty of attempted aggravated criminal sexual assault and false personation of a peace officer.

¶ 33    Defendant subsequently filed a motion for new trial, arguing in part that the trial court erroneously permitted the State to present evidence of the police badge found in defendant's vehicle, where K.W. testified that she had not seen the badge during the assault.

¶ 34    The court denied defendant's motion and sentenced him to 30 months in the adult probation sex offender program for attempted aggravated criminal sexual assault and false personation of a peace officer. Defendant's attempted aggravated criminal sexual assault conviction was predicated on defendant attempting to commit criminal sexual assault during the course of commission of another felony, namely, false personation of a peace officer. Defendant's false personation conviction was predicated on him falsely personating a peace officer while attempting to commit criminal sexual assault.

¶ 35                                    II. Analysis

¶ 36                              A. Excited Utterance

¶ 37    On appeal, defendant first asserts that the trial court erred by granting the State's motion *in limine* to admit K.W.'s hearsay statements to Woods as an excited utterance. Defendant acknowledges that he forfeited this issue by failing to include it in his posttrial motion but urges us to review it as plain error. *People v. Denson*, 2014 IL 116231, ¶ 11 (issue preserved for appeal by (1) raising it in either a motion *in limine* or contemporaneous trial objection and (2) including it in posttrial motion).

¶ 38    Relief under the plain error doctrine is warranted where (1) the evidence is closely balanced, regardless of the seriousness of the error; or (2) the error is so serious that it affected the fairness of the trial and challenged the judicial process's integrity, regardless of the closeness of the evidence. *People v. Bush*, 2023 IL 128747, ¶ 71. Under either prong, however, there must be a clear or obvious error. *Id*. Defendant here asserts plain error under both prongs. In applying the plain error doctrine, we first determine whether error occurred at all because, without error, there can be no plain error. *People v. Hood*, 2016 IL 118581, ¶ 18.

¶ 39    " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Hearsay is generally inadmissible. Ill. R. Evid. 802 (eff. Jan. 1, 2011). An exception exists, however, for excited utterances (Ill. Evid. R. 803(2) (eff. Jan. 25, 2023)), also known as the spontaneous declaration exception (*People v. Georgakapolous*, 303 Ill. App. 3d 1001, 1012 (1999)). This exception applies to "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Ill. Evid. R. 803(2) (eff. Jan. 25, 2023).

¶ 40    The excited utterance exception is based on the notion that under certain external shocking circumstances, the resulting stress may inhibit a person's reflective faculties and remove her control such that her utterance is a spontaneous, sincere response to the sensations and perceptions caused by the external shock, rather than the product of reason and reflection. *Georgakapolous*, 303 Ill. App. 3d at 1012. Thus, the utterance may be accepted as the speaker's real belief regarding the facts she has just observed. *Id*. To demonstrate that this exception applies, a party must demonstrate (1) an occurrence startling enough to produce a spontaneous and unreflecting statement; (2) an absence of time to fabricate the statement; and (3) the statement's relationship to the circumstances of the occurrence. *People v. Sutton*, 233 Ill. 2d 89, 107 (2009). No factor is determinative. *People v. Gwinn*, 366 Ill. App. 3d 501, 517 (2006). Courts consider the totality of the circumstances to determine whether this exception applies. *Sutton*, 233 Ill. 2d at 107. This includes several relevant factors, such as the nature of the event, the period of time between the event and the utterance, the declarant's physical and mental condition, and the presence or absence of self-interest. *People v. Perkins*, 216 Ill. App. 3d 389, 396 (1991).

¶ 41    With regard to the absence of time element, our critical inquiry is whether the declarant spoke while the excitement of the event predominated. *Sutton*, 233 Ill. 2d at 107. While a statement is deemed reliable under this exception due to the absence of time (*People v. Victors*, 353 Ill. App. 3d 801, 809-10 (2004)), the amount of time that may pass varies greatly (*Sutton*, 233 Ill. 2d at 107). It is elusive. *People v. Gacho*, 122 Ill. 2d 221, 241 (1988). In addition, a declarant may make a spontaneous declaration to a person even after having spoken previously to another. *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 71. A declaration's spontaneity is not destroyed solely because the declarant spoke to someone on a topic prior to making the admitted statement regarding the same. *Perkins*, 216 Ill. App. 3d at 397.

¶ 42    The trial court has considerable discretion in determining whether a statement constitutes an excited utterance. *Georgakapolous*, 303 Ill. App. 3d at 1012. Because the excited utterance exception depends upon a case's particular circumstances, the trial court should be given a reasonable degree of latitude. *People v. Connolly*, 406 Ill. App. 3d 1022, 1026 (2011). We will only find an abuse of discretion "where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). We will not reverse the trial court's determination where reasonable minds can differ. See *People v. Adams*, 2023 IL App (2d) 220061, ¶ 62.

¶ 43    Here, defendant drove K.W. 20 blocks away from Woods, who had been accompanying K.W. for protection. Defendant asked K.W. if she knew "what it feels like to be raped," pointed a BB gun at her, grabbed her hair, and forced her head toward his groin area after exposing his "private area." K.W. thought the BB gun was a firearm and was "scared for [her] life" because she had been shot before. The experience of the attempted sexual assault at gunpoint undoubtedly

- 11 -

qualified as a startling occurrence, and her later statements to Woods that she was almost raped directly related to the experience. See *People v. Lloyd*, 277 Ill. App. 3d 154, 163 (1995) (victim's statement to a witness that she was raped related to a sufficiently startling occurrence).

¶ 44    Upon escaping from defendant's car, K.W. ran until she saw a woman and asked her for help. K.W. then proceeded walking until she saw someone she knew, who drove her to a gas station. From the gas station, K.W. walked to Woods and told him she was "almost raped and kidnapped." According to Woods, K.W. more specifically stated that defendant claimed to be an officer, had a handgun, and "tried to make her suck his dick and have sex with him." While her statements were made to Woods 30 minutes after the incident occurred, evidence showed K.W. remained distressed at that time. Woods described K.W. as scared, angry, and erratic when she made this statement. Video evidence also depicted K.W. swiftly approaching Woods and speaking in an agitated fashion while waving her arms.

¶ 45    The record supports the trial court's finding that the shock of the attempted sexual assault at gunpoint still predominated when K.W. made the statements, after K.W. spent 30 minutes attempting to escape from defendant and find Woods. *Sutton*, 233 Ill. 2d at 108 (finding that "the 20-minute passage of time between the crime and [the declarant's] statements did not destroy the spontaneity of those statements"). The mere fact that 30 minutes passed between the incident and the statements does not affect this finding, as the time that may pass under the excited utterance exception may vary greatly depending on the circumstances. *Id.* At 107. We therefore cannot say that the finding was arbitrary, fanciful, or unreasonable. *Caffey*, 205 Ill. 2d at 89. Nor will we overturn the court's determination simply because reasonable minds could differ as to whether K.W. could have fabricated a story during those 30 minutes. *Adams*, 2023 IL App (2d)

220061, ¶ 62. We therefore conclude that the court did not abuse its discretion in finding the excited utterance exception applied to K.W.'s statements.

¶ 46    Defendant asserts that K.W.'s encounters with the two people before speaking with Woods were essentially intervening discussions that broke the spontaneity of K.W.'s statements. Defendant cites a number of cases in which this court found that statements made in response to questioning are not excited utterances, as being asked a series of questions breaks the spontaneity and immediacy required for excited utterances. See *People v. Busch*, 2020 IL App (2d) 180229, ¶¶ 12-17, 41 (declarant was asked if she needed an ambulance by a witness, then was asked "a series of questions" by a 911 operator); *People v. Victors*, 353 Ill. App. 3d 801, 810 (2004) (declarant questioned by police officer for about five minutes before making hearsay statements to another officer); *People v. Sommerville*, 193 Ill. App. 3d 161, 175 (1990) (declarant gave "repeated detailed answers" to a "series of questions").

¶ 47    That was not the case here, however, where the evidence did not show K.W. was subjected to any questioning that would cause her to "reflect on the statement." *Busch*, 2020 IL App (2d) 180229, ¶ 41. Rather, K.W. asked a woman for help, and then subsequently received a ride from a second person, while attempting to get away from defendant and reach Woods. Given the facts presented to the trial court, the court did not abuse its discretion in finding that K.W. remained in a state of shock throughout these encounters, as she searched for help in returning to Woods. See *Perkins*, 2018 IL App (1st) 133981, ¶ 71 (a person may make an excited utterance after having spoken to another person). The spontaneity of K.W.'s statement to Woods was not destroyed solely because she spoke to others. *Perkins*, 216 Ill. App. 3d at 397.

¶ 48 Defendant also asserts that K.W. had a motive to fabricate her story, repeating his theory at trial that Woods was K.W.'s pimp, and K.W. was afraid of returning to Woods without money after meeting with defendant. Defendant claims that K.W. fabricated the story to avoid angering Woods. However, the excited utterance exception "*presumes* the existence of a motive to fabricate in many declarants." (Emphasis in original.) *People v. Abram*, 2016 IL App (1st) 132785, ¶ 73. "It is the power of a sudden, startling event depriving the declarant of the opportunity to reflect, and thus to act on that motive, that makes a statement presumptively trustworthy." *Id.* Given that the record supported the trial court's conclusion that K.W. did not have time to act on any motive to fabricate her story, whether such a motive existed would not affect the admissibility of the statements.

¶ 49 Nor are we persuaded by defendant's arguments that K.W. was not severely enough harmed to still be shocked 30 minutes afterward, based on the facts that K.W. did not suffer a severe physical injury and was not successfully penetrated during the attempted sexual assault. Defendant drove K.W. to an area that she was unfamiliar with, 20 blocks away from her boyfriend. He pointed what she believed was a firearm at her, pulled her hair, and tried to force her head toward his penis. We cannot conclude that the trial court abused its discretion in finding K.W. was still sufficiently shocked to make an excited utterance 30 minutes after enduring such a violating experience. See *People v. Coty*, 2020 IL 123972, ¶ 26 (quoting *Coker v. Georgia*, 433 U.S. 584, 597 (1977)) (Sexual assault is "[s]hort of homicide, *** the ultimate violation of self." (Internal quotation marks omitted.)).

¶ 50 The trial court did not abuse its discretion in admitting K.W.'s statement to Woods under the excited utterance exception to the inadmissibility of hearsay statements. Because no error

occurred, we must conclude that no plain error occurred and that trial counsel could not have been ineffective for failing to preserve the issue in a posttrial motion. See *People v. Colone*, 2024 IL App (1st) 230520, ¶ 132 (rejecting plain error and ineffective assistance claims after concluding no error occurred).

¶ 51                                   B. Relevance of Police Badge and FOP Sticker

¶ 52    Defendant next argues that the trial court erred in admitting evidence of the police badge and FOP sticker on his windshield. He asserts that the evidence was irrelevant as to the instance of false personation to K.W., since the trial evidence reflected that K.W. had not seen either piece of evidence. Defendant states that the evidence was essentially used as other-crimes evidence to insinuate that defendant had a propensity for, and practice of, falsely personating a police officer.

¶ 53    Defendant preserved this issue as to the police badge, as he challenged its admission in a motion *in limine* and in his posttrial motion. See *Denson*, 2014 IL 116231, ¶ 11. However, he acknowledges that he did not preserve the issue as to the FOP sticker on his windshield, as the evidence was not challenged in a motion *in limine* or contemporaneously at trial, and it was not raised in a posttrial motion. Defendant nonetheless asserts that we may examine the issue under the plain error doctrine. As to both the preserved issue and the forfeited issue, we first turn to the question of whether an error occurred. *Hood*, 2016 IL 118581, ¶ 18

¶ 54    Relevant evidence is generally admissible unless otherwise provided by law. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence will be deemed relevant where it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). It is within the circuit court's discretion to determine whether evidence is relevant and admissible, and

we will not disturb that determination absent an abuse of discretion. *Peach v. McGovern*, 2019 IL 123156, ¶ 25.

¶ 55    Here, the evidence in question concerned defendant's charge for false personation of a peace officer under section 17-2(b)(6) of the Criminal Code of 2012 (Code) (720 ILCS 5/17-2(b)(6) (West 2018). Section 17-2(b)(6) provides that a person commits false personation by "knowingly and falsely" representing himself or herself to be a peace officer in attempting or committing a forcible felony, here, criminal sexual assault. *Id.*

¶ 56    The parties disputed the identity of the offender at trial. Defendant asserted that he was not the person who stated he was a police officer and attempted to sexually assault K.W. The accuracy of K.W.'s observations and her identification of defendant and the car he drove were challenged extensively during K.W.'s cross-examination. Moreover, defendant argued in closing that K.W. did not observe defendant's tattoo during the incident and later observed defendant in a different car, stating "[t]hat's how you know it wasn't him."

¶ 57    The State, however, submitted evidence that defendant was seen in two differently colored cars of the same make and model. The first car, a black Chevrolet Malibu, was driven by defendant when he falsely personated a peace officer to K.W. The other car, a blue Chevrolet Malibu, was found to be in defendant's possession after the incident and in the parking lot of defendant's workplace when he was arrested. Law enforcement confirmed that defendant owned the blue Malibu, which contained the police badge and FOP sticker at issue, as well as a BB gun that K.W. stated resembled the gun used during the incident. The fact that, at the time of defendant's arrest, his blue Malibu contained items that could be used to falsely personate an officer, along with the BB gun that may have been used in the actual crime, helped link defendant to the offender who

drove the black Malibu. See *People v. Jones*, 269 Ill. App. 3d 797, 803 (1994) (evidence of large amounts of weapons and cash were proper circumstantial evidence to infer defendant's intent to deliver a controlled substance). This evidence was relevant to corroborate the identification of defendant as the person who picked up K.W. and told her he was a police officer before attempting to assault her. See Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 58    Defendant contends that evidence of the badge and FOP sticker was improperly used as other-crimes evidence insinuating that he had a propensity for falsely personating a police officer. We disagree.

¶ 59    Evidence of other crimes is inadmissible "if it is relevant only to show the defendant's propensity to engage in criminal activity." *People v. Rios*, 2022 IL App (1st) 171509, ¶ 64. The rule against other-crimes evidence "is an aspect of the rule that the prosecution may not introduce evidence of a character trait of the accused." *People v. Pikes*, 2013 IL 115171, ¶ 16. The concern is that other-crimes evidence has "too much" probative value and may cause the jury to convict a defendant simply for being a "bad person deserving punishment." (Internal quotation marks omitted.) *People v. Moore*, 2023 IL App (1st) 211421, ¶ 93. Other-crimes evidence encompasses misconduct or criminal acts that occurred before or after the alleged criminal conduct for which the defendant stands trial. *People v. Norwood*, 362 Ill. App. 3d 1121, 1128 (2005). The admissibility of other-crimes evidence is entrusted to the sound judgment of the trial court, whose decision we will not reverse absent an abuse of discretion. *People v. Cerda*, 2021 IL App (1st) 171433, ¶ 98.

¶ 60    Here, the State did not submit evidence regarding the badge and FOP sticker as evidence that defendant committed other crimes and thus had a character trait making him more likely to

commit the crime at hand. See *Pikes*, 2013 IL 115171, ¶ 16 (rule against other-crimes evidence is an aspect of the rule against character trait evidence). The State submitted no evidence of any other incidents in which defendant used the badge and FOP sticker to "knowingly and falsely represent*** himself" to be a police officer. See 720 ILCS 5/17-2(b) (West 2018); *cf. People v. Reyes*, 328 Ill. App. 3d 918, 924, 928 (2002) (the defendant committed false personation of a peace officer when he told a police officer that he was also a police officer and pointed to a FOP sticker on his windshield). There was no evidence as to why there was an FOP sticker on defendant's car or how long it was there. There was also no evidence that defendant ever removed the badge from his trunk, displayed it, or otherwise interacted with it aside from picking it up off the ground at a Walmart. The State presented very little evidence regarding the two items other than them being found in defendant's car when defendant was arrested. See *People v. McLaurin*, 2015 IL App (1st) 131362, ¶ 53 (evidence that the defendant had been seen with a gun before was not other-crimes evidence submitted to show propensity, where there was no evidence regarding whether the prior possession was unlawful).

¶ 61    The limited amount of information entered regarding the badge and sticker also did not insinuate defendant committed any other specific crimes so that the evidence would be inadmissible. They were simply items found upon defendant's arrest that helped to corroborate K.W.'s identification of defendant. See *People v. Hagen*, 63 Ill. App. 3d 944, 949 (1978) (where the defendant was charged with burglary, evidence of a screwdriver and police radio found in the defendant's vehicle upon arrest "did not suggest or infer other crimes," even though they were not related to the charged crime).

¶ 62    In any case, even had the evidence of the badge and sticker constituted other-crimes evidence, it would have been admissible because it was relevant for a purpose other than propensity, *i.e.*, identity. *People v. Botsis*, 388 Ill. App. 3d 422, 442 (2009) (other-crimes evidence is admissible if relevant for "any other purpose"); Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) (other-crimes evidence may be admissible as proof of identity).

¶ 63    Because the police badge and FOP sticker were relevant to show identity and did not constitute other-crimes evidence, we find that the trial court did not abuse its discretion in allowing the evidence. Because we find no error occurred here, we need not address defendant's claims of plain error as to the sticker, or ineffective assistance for failure to preserve the issue as to the sticker. See *Colone*, 2024 IL App (1st) 230520, ¶ 132.

¶ 64                              C. One-Act, One-Crime Doctrine

¶ 65    Finally, defendant asserts that his conviction of false personation of a peace officer must be vacated because his convictions for attempted aggravated criminal sexual assault and false personation violate the one-act, one-crime doctrine. The State concedes this issue.

¶ 66    As an initial matter, we agree with the parties that this issue may be reviewed under the second prong of the plain error doctrine. See *People v. Coats*, 2018 IL 121926, ¶ 10 (one-act, one-crime violations fall within the second prong of the plain error doctrine as "an obvious error so serious that it challenges the integrity of the judicial process").

¶ 67    The one-act, one-crime doctrine provides that a defendant cannot be convicted of multiple offenses based on the same physical act. *People v. Smith*, 2019 IL 123901, ¶ 13. The rule additionally prohibits multiple convictions where the offenses are based on separate physical acts, but one offense is a lesser-included offense of the other. *People v. Miller*, 238 Ill. 2d 161, 165

(2010). The predicate offense for another offense is considered a lesser-included offense of the other crime. See *People v. Gillespie*, 2024 IL App (4th) 121146, ¶ 14 (collecting supreme court cases). We apply a two-step analysis here. *Reveles-Cordova*, 2020 IL 124797, ¶ 12. First, we must consider whether defendant's conduct involved multiple acts or a single act. *Id.* Second, if the conduct involved multiple acts, the court then must determine whether one offense is a lesser-included offense of another. *Id.* If an offense is a lesser-included offense, multiple convictions are improper. *Id.*

¶ 68    When determining whether an offense is a lesser-included offense, we apply the "abstract elements approach." *Smith*, 2019 IL 123901, ¶ 37. Under this approach, we compare the statutory elements of the two offenses. *Id.* If all the elements of one offense are included within the second offense and the first offense contains no elements not included in the second offense, the first offense is deemed a lesser-included offense of the second. *Id.* In that case, the less serious offense must be vacated. *People v. Garcia*, 179 Ill. 2d 55, 71 (1997). For one offense to be the lesser-included offense of another, "it must be impossible to commit the greater offense without necessarily committing the lesser offense. *Reveles-Cordova*, 2020 IL 124797, ¶ 13.

¶ 69    We review potential violations of the one-act, one-crime doctrine *de novo*. *People v. Allen*, 2024 IL App (1st) 221681, ¶ 89.

¶ 70    We agree with the parties that defendant's two convictions violate the one-act, one-crime doctrine.

¶ 71    Here, defendant was convicted of attempted aggravated criminal sexual assault and false personation of a peace officer. Section 11-1.20(a)(1) of the Code (720 ILCS 5/11-1.20(a)(1) (West 2018) provides that a person commits criminal sexual assault if that person commits an act of

sexual penetration and "uses force or threat of force." Defendant was charged with attempting aggravated criminal sexual assault as described in section 11-1.30(a)(4) of the Code (720 ILCS 5/11-1.30(a)(4) (West 2018)), which provides that a person commits aggravated criminal sexual assault by committing criminal sexual assault "during the course of committing or attempting to commit any other felony." *Id.* The indictment identifies false personation of a peace officer as the predicate offense for defendant's attempted aggravated criminal sexual assault conviction.

¶ 72    As we have stated, defendant was also charged with false personation of a peace officer for knowingly and falsely representing himself to be a peace officer while attempting to commit criminal sexual assault. 720 ILCS 5/17-2(b)(6) (West 2018).

¶ 73    Defendant's two convictions are predicated on one another, so that defendant could not have committed either crime without committing the other. Both convictions share the same elements, as they both required defendant to attempt to commit an act of sexual penetration by force or threat of force, while knowingly representing himself to be a peace officer. It is therefore impossible for defendant to have committed either offense without necessarily committing the other. See *Gillespie*, 2014 IL App (4th) 121146, ¶ 23 (finding it was impossible to commit aggravated criminal sexual assault predicated on another felony without necessarily committing the predicate felony, and so the abstract elements approach was satisfied). As such, defendant's convictions violate the one-act, one-crime doctrine and defendant has established second-prong plain error. *Coats*, 2018 IL 121926, ¶ 10.

¶ 74    Having determined that defendant's convictions for attempted aggravated criminal sexual assault and false personation of a peace officer violate the one-act, one-crime doctrine, we must now determine which is the more serious offense.

¶ 75     To remedy a violation of the one-act, one-crime doctrine, sentence must be imposed on the more serious offense and the less serious offense must be vacated. See *People v. Artis*, 232 Ill. 2d 156, 170 (2009). In determining which offense is more serious, this court will compare the relative punishments prescribed by the legislature for each offense. *Id.* "It is common sense that the legislature would provide greater punishment for crimes it deems more serious." *People v. Lee*, 213 Ill. 2d 218, 228 (2004). Where the offenses provide for identical punishments, courts will remand to the trial court to determine which convictions should be retained. *Artis*, 232 Ill. 2d at 170.

¶ 76     Defendant's attempted aggravated criminal sexual assault and false personation convictions are both classified as Class 1 offenses. 720 ILCS 5/11-1.30(d)(1) (West 2018) (aggravated criminal sexual assault constitutes a Class X felony); 720 ILCS 5/8-4(c)(2) (West 2018) (attempted Class X felony sentenced as Class 1 felony); 720 ILCS 5/17-2(f)(7) (false personation under section 17-2(b)(6) is a Class 1 felony). Accordingly, both convictions carry a sentencing range of 4 to 15 years and a mandatory supervised release (MSR) term of 2 years. 730 ILCS 5/5-4.5-30(a), (l) (West 2018) (Class 1 sentencing range and MSR term). Attempted aggravated criminal sexual assault, however, additionally subjects defendant to registration as a sex offender. 730 ILCS 150/2(E)(1) (West 2018); 730 ILCS 150/7 (West 2018). We therefore agree with the parties that attempted aggravated criminal sexual assault is the more serious offense. See *People v. Richardson*, 2022 IL App (1st) 191689-U, ¶ 20 (finding aggravated criminal sexual assault is a more serious offense than home invasion because it carries a potentially longer MSR

term and subjects the defendant to registration as a sex offender).[1] We affirm defendant's conviction and sentence for attempted aggravated criminal sexual assault but vacate his conviction and sentence for false personation of a peace officer. See *Artis*, 232 Ill. 2d at 170.

¶ 77                                III. Conclusion

¶ 78     For the foregoing reasons, we vacate defendant's conviction for false personation of a peace officer. We otherwise affirm the judgment of the circuit court.

¶ 79     Affirmed in part; vacated in part.

---

[1] Cited as persuasive authority under the Illinois Supreme Court Rule 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered under Rule 23(b) on or after January 1, 2021, may be cited for persuasive purposes).